**PACIFIC TRANSPORT COMPANY and Subsidiaries, Appellee-Cross-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant-Cross-Appellee.**

**PACIFIC ATLANTIC STEAMSHIP COMPANY, Appellee-Cross-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant-Cross-Appellee (two cases).**

**STATES STEAMSHIP COMPANY, etc., Appellee-Cross-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant-Cross-Appellee (two cases).**

**STATES STEAMSHIP COMPANY, Appellee-Cross-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant-Cross-Appellee.**

**PORTLAND STEVEDORING COMPANY, Appellee-Cross-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant-Cross-Appellee (two cases).**

**PACIFIC TRANSPORT LINES, INC., Appellee-Cross-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant-Cross-Appellee.**

**CALIFORNIA EASTERN LINES, INC., Appellee-Cross-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant-Cross-Appellee (two cases).**

**PACIFIC TRANSPORT COMPANY, and Subsidiaries, et al., Appellants-Cross-Appellees,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee-Cross-Appellant.**

Nos. 71-1754 to 71-1764, 71-1810.

United States Court of Appeals, Ninth Circuit.

Aug. 16, 1973.

Rehearing Denied Sept. 10, 1973.

Janet R. Spragens, Atty. (argued), Fred B. Ugast, Acting Asst. Atty. Gen., Scott P. Crampton, Acting Asst. Atty. Gen., Tax Div., Dept of Justice, K. Martin Worthy, IRS Chief Counsel, Meyer T. Rothwacks, Ernest J. Brown, Tax Div., Dept. of Justice, Washington, D. C., for appellant and appellant and appellee in No. 71–1810.

Valentine Brookes (argued), Richard A. Wilson, of Brookes, Maier & Wilson, San Francisco, Cal., for the appellees and appellants in No. 71–1810.

## OPINION

Before ELY and KILKENNY, Circuit Judges, and SKOPIL, District Judge.*

PER CURIAM:

These appeals and cross-appeals are prosecuted from decisions of the tax court involving corporate income taxes for the tax year 1958 and certain tax periods in 1957. The taxpayers consist of a group of affiliated steamship companies. The deficiencies arise from the reduction of a net operating loss claimed by the group in 1959, a year not in issue, and carried back to taxable periods in 1957 and 1958, two open years.

### Factual Background

The essential facts are not in dispute. In 1956, and prior years, Dant & Russell, Inc. [D & R], was a family owned corporation of the Dant family, with interests principally involved in the lumber and shipping areas. The shipping interests of the corporation were in the main managed by D. R. (Jack) Dant [Dant], who owned 19% of its capital stock. On July 10, 1956, D & R owned all of the capital stock of States Steamship Company, a Nevada corporation [Old States], and of Pacific Atlantic Steamship Company [Pacat]. Old States, in turn, owned all of the capital stock of Pacific Transport Lines, Inc., Portland Stevedoring Company and Quaker Line, Inc. Additionally, it controlled 43.66% of the stock of California Eastern Lines, Inc. Dant was the vice-president and general manager of Old States from 1950 to 1956.

The problems with which we are concerned on this appeal are centered on the purchase of the stock of Old States [July 11, 1956] and its subsequent liquidation [June 30, 1957] by a newly formed corporation named States Line, Inc. [New States]. New States was incorporated in Nevada on June 28, 1956, by Dant, who paid cash for all of its capital stock. New States then borrowed additional amounts from banks and other sources and with these funds purchased the stock of Old States. Dant's overall plan was for New States to liquidate Old States and acquire its assets within two years as contemplated by Section 334(b)(2) of the Internal Revenue Code [26 U.S.C. § 334(b)(2)]. Old States was then continued as a

* The Honorable Otto R. Skopil, Jr., United States District Judge for the District of Oregon, sitting by designation.

wholly owned subsidiary of New States for slightly less than a year and then liquidated on June 30, 1957.

The purchase of Old States' stock by New States was part of a larger transaction involving the sale of all of the stock of D & R to a third party, Blythe & Company [Blythe] followed by a resale of the steamship interests of the corporation back to Dant. Blythe's negotiations to acquire the D & R stock commenced early in 1956, when Blythe entered into an option, purchase and escrow ageement with all of the stockholders of D & R, with the exception of Dant. The following June, Blythe and Dant signed what was known as a "pledge" agreement with the Bank of California in an effort to allow Blythe to acquire all of the stock of D & R and then sell to Dant the stock of Old States and Pacat. In line with this agreement, Blythe on July 10, 1956, acquired all of the stock of D & R and then caused that company to be dissolved. Blythe then caused Old States, whose stock it had acquired in the dissolution, to pay a dividend of $2,500,000.00. On the following July 11th, Blythe sold to Dant the stock of Pacat for $1,950,000.00 and New States, formed less than two weeks before by Dant, purchased all of the stock of Old States for- $11,050,000.00.

As an outgrowth of these transactions, Dant personally owned all of the capital stock of Pacat and New States. New States, in turn, owned all of the stock of Old States, which owned Portland Stevedoring Company, Pacific Transport Lines and California Eastern Lines. Consequently, the liquidation of Old States into New States occurred less than two years after New States had purchased the former's stock and the transaction qualified under 26 U.S.C. § 334(b)(2). Likewise, the liquidation fell within the provisions of § 78.540, Revised Statutes of Nevada, which required New States to assume all of the liabilities of Old States.

All of the above transactions occurred subsequent to and were based upon, at least in part, the decision of the United States District Court for the District of Oregon, dated November 17, 1955, in which the court limited liability of Old States for the loss of cargo in connection with the loss on January 9, 1952, of the vessel S.S. PENNSYLVANIA, a cargo ship owned and operated by Old States, which was lost at sea in the Pacific with all of its cargo and crew. The litigation involving the loss of the lives of the members of the crew was settled by Old States prior to 1956. All parties appealed from the decision of the district court in connection with the loss of cargo. The decision of the district court was affirmed by the court of appeals in States Steamship v. United States, 9 Cir., 259 F.2d 458, on May 31, 1957. Worthy of comment is the fact that the judgment was affirmed approximately one month prior to the liquidation of Old States into New States on June 30, 1957. Then the eccentricities of the law threw the master plan into a tailspin. The parties filed petitions for rehearing. On November 15, 1957, the court of appeals did an about face, reversed its previous stand and held that Old States liability to shippers could not be limited. States Steamship Co. v. United States, 259 F.2d 458, 463. The problem faced by the court in exercising the feminine prerogative of changing its mind is exemplified by the closing paragraph on the second petition for rehearing, which we quote:

"In this effort to clarify our decision we believe we have at least somewhat improved upon the statements made in our November 15, 1957, opinion."

Certiorari was denied, States Steamship Co. v. United States, 358 U.S. 933, 79 S. Ct. 316, 3 L.Ed.2d 305 (January 12, 1959), 359 U.S. 921, 79 S.Ct. 579, 3 L. Ed.2d 583 (February 24, 1959). On remand to the district court, the case was settled for $1,455,394.00.

While the appeal was pending, Dant had been advised by his attorneys that: ". . . While no law suit is a certainty . . .", and that a large adverse judgment ". . . Must be reck-

oned with as a possibility. . . .", the chances of an affirmance of the district court's opinion by the court of appeals, so that Old States would not be liable for the cargo loss in excess of its insurance coverage, were about ". . . 75 to 80%." The tax court found that on the date of New States' acquisition of Old States' stock, the cargo loss liability was both contingent and remote and that the parties *did not discount the stock purchase price to account for it.*

While many other transactions occurred with and between the affiliated groups, we believe the above statement is sufficient for our purposes.

In their 1959 consolidated income tax returns, Pacific Transport Company and its wholly owned subsidiaries Pacat, New States, California Eastern Lines, Inc. and Portland Stevedoring Company, reported a net operating loss of $1,455,802.07. This loss was made up of $1,431,267.78 net operating loss claimed by New States, of which, in turn, the major component was $1,348,868.00 named as a deduction for payment of the judgment rendered against Old States. After the return was filed, three of the affiliated corporations claimed carrybacks, pursuant to §§ 172(a) and (b) of the Internal Revenue Code. Pacific Transport Company claimed carrybacks to September-December 1957, and to 1958. New States claimed a carryback to January-September, 1957. Pacat claimed a carryback to January-September, 1957. Upon the request of IRS, all of the parties executed the usual form, Consent Agreements, to extend the statute of limitations for assessment with respect to the taxable period from 1957 and 1958, here involved. Insofar as here relevant, the Commissioner determined that the cargo loss payment made by New States was not an allowable expense deduction, but should be added to New States' basis in the assets of Old States, as an additional cost thereof. On the taxpayer's petition for redetermination of the deficiency in the tax court, it was held that New States should be permitted a current deduction in 1959 for the cargo loss payment. It is from this decision that the Commissioner appeals.

### Issue

■ Simply stated, the issue presented is whether a payment made by a parent corporation in discharge of a contested tort liability, first asserted against a subsidiary corporation and necessarily assumed by the parent corporation upon liquidation of the subsidiary, pursuant to the provisions of 26 U. S.C. §§ 332 and 334(b)(2), should have been capitalized and added to the parent's basis in the assets acquired from the subsidiary as contended by appellant, or was currently deductible by the parent corporation, as contended by appellee.

### Merits

While we entertain no doubt that the initiation and consummation of the transaction between Old States and New States was premised on Old States' primary success in its litigation in connection with the loss of the S.S. PENNSYLVANIA, and that the parties, after the initial affirmance by this court, had reasonable grounds to believe that the chances of reversal were practically non-existent, nevertheless, appellees find themselves in the unfortunate position of facing up to the provisions of § 334(b)(2) and two recent Supreme Court decisions which speak on the problem under circumstances closely related to ours.

Decisively persuasive on the issue before us are Woodward v. Commissioner of Internal Revenue, 397 U.S. 572, 90 S. Ct. 1302, 25 L.Ed.2d 577 (1970), and United States v. Hilton Hotels, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970), two decisions which, although factually distinguishable, greatly clarify the law with reference to capital expenditures made in connection with the acquisition of property. Both cases were concerned with appraisal costs incurred in connection with the acquisition of

capital stock. In both cases, the expenses were treated as capital expenditures to be added to the taxpayer's cost basis in the stock.

In *Woodward,* the taxpayers owned and controlled the majority of the common stock of an Iowa company. In 1960, they voted to extend the charter indefinitely, but a minority dissented. Under Iowa law, majority stockholders [taxpayers] in these circumstances were required to purchase the minority interest. The value of those interests were appraised in a state court proceeding and the taxpayers purchased the interest at the price fixed by the court. Incurred in connection with the appraisal litigation were attorneys', accountants' and appraisement fees. It was the tax treatment of these payments which constituted the subject before the Supreme Court. It held that the payments were part of the cost of acquiring the dissenting shareholders' stock and consequently should be capitalized.

In *Hilton Hotels,* the taxpayer was a corporation which owned approximately 90% of the shares of stock in the Waldorf-Astoria corporation. As in the present case, the taxpayer decided to merge that corporation into itself, distributing its stock in exchange for that of Waldorf-Astoria in a nontaxable transaction. A minority of the shareholders objected to the merger. Exercising its majority interest in the Waldorf-Astoria stock, the taxpayer voted to approve the merger. Appraisal proceedings were then instituted to place a value on the dissenting shareholders' stock. Taxpayer in its return deducted the fees it paid its lawyers and for other professional services in connection with the appraisal proceeding. The Supreme Court held that such expenses were not deductible, but were part of the cost of acquiring the dissenters' stock.

Like *Woodward* and *Hilton,* the present case involves a question of whether a payment made in connection with the acquisition of property [1] is cur-

rently deductible or whether it must be added to the taxpayer's cost basis in the assets. Though the purchase price of Old States' stock was not discounted for the cargo loss liability, there is no question but that the parties were aware of the contingent liability and that upon liquidation, the assets of Old States were taken subject to that liability. Our analysis of *Woodward* and *Hilton* reveals nothing which would permit an exception to capital gains treatment where taxpayers enter into bargains, proceed under a mistake of law, or fail to realize the substance or amount of the liability assumed.

The tax court in holding that intent was a relevant factor in determining whether the cargo loss payment was a capital, as distinguished from an ordinary expenditure relied principally upon Helvering v. Metropolitan Edison Co., 306 U.S. 522, 59 S.Ct. 634, 83 L.Ed. 957 (1939), and Eaton v. Commissioner of Internal Revenue, 81 F.2d 332 (C.A.9, 1935). Appellees utilize the same cases in their briefs and arguments before this court. All parties agree that the liquidation of Old States was governed by the provisions of § 334(b)(2) of the 1954 Internal Revenue Code, the provisions of which were non-existent at the time of the *Eaton* and *Metropolitan Edison* decisions. That the *Kimbell-Diamond* philosophy is no longer controlling is stressed in the recent ninth circuit case of Boise Cascade Corp. v. United States, 288 F.Supp. 770 (D.Ida.1968), aff'd per curiam 429 F.2d 426 (C.A.9, 1970), in which we affirmed for the reasons stated in the opinion of the district court. There, as here, the taxpayer argued that if a corporation acquires the stock of another and liquidates the stock, the acquiring corporation's intent governed the basis for the assets of the liquidated corporation. In rejecting this contention, the district court said:

". . . Section 334(b)(2) was passed by Congress to eliminate a subjective intent test enunciated in

---

1. In *Woodward* and *Hilton,* the dissenters' stock; in this case, the assets of Old States.

Kimbell-Diamond Milling Co. v. Commissioner [of Internal Revenue] 14 T.C. 74 (1950), affirmed per curiam, 187 F.2d 718 (5th Cir.1951), certiorari denied, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951). . . ." [Page 774]

The opinion then goes on to emphasize that intent was the controlling factor of the *Kimbell-Diamond* decision. Again, we quote:

". . . Section 334(b)(2) eliminated this intent test and much litigation was laid to rest. Taxpayer endeavors to offer another intent test in a § 334(b)(2) acquisition and liquidation problem. Congress eliminated one intent test which gave rise to considerable litigation and this court does not believe another intent case is justified in this case. The intent of the taxpayer at the time of acquiring the stock is not material to a determination of the question presented here." [Page 774]

Needless to say, the tax court could not anticipate the affirmance in *Boise Cascade.* For that matter, it would seem the tax court was not aware of the district court decision since it is not cited in the tax court opinion.

In any event, the intent test utilized by the tax court was rejected by this circuit in *Boise Cascade.*

The fact that the liability was contingent and unliquidated at the time of acquisition by New States is of no significance. Holdcroft Transportation Co. v. Commissioner of Internal Revenue, 4 T. C.M. 508 (1945), aff'd 153 F.2d 323 (C. A.8, 1946). As well stated in Magruder v. Supplee, 316 U.S. 394, 398, 62 S.Ct. 1162, 86 L.Ed. 1555 (1942), the payment of a liability by a subsequent purchaser is not the discharge of a burden, which the law has placed upon him, but is actually as well as theoretically, a payment of the purchase price. Other cases in direct conflict with the decision of the tax court include Arrowsmith v. Commissioner of Internal Revenue, 344 U.S.

6, 73 S.Ct. 71, 97 L.Ed. 6 (1952); United States v. Skelly Oil Co., 394 U.S. 678, 684–685, 89 S.Ct. 1379, 22 L.Ed.2d 642 (1969).

The numerous other authorities cited by appellees and a number of others cited by appellants have received our attention. An analysis of these authorities would add nothing to the validity of our conclusions, nor would it be of any particular benefit to the judicial system.

*Statute of Limitations*

Appellees, as an alternative, assert that the government claims are barred by the statute of limitations. The deficiencies arise from the disallowance of a net operating loss claimed by taxpayers in 1959 and carried back to taxable periods in 1957 and 58. With respect to the latter, each taxpayer executed a form consenting to extend the statute of limitations. No consent form was signed for the tax year 1959. The consent forms were mailed to the Commissioner while the statute of limitations for the tax year 1959 was still open. Taxpayers argue that the bar of the statute with respect to the year 1959 prevents the Commissioner from determining the deficiencies for 1957 and 1958, which deficiencies arose as a result of the disallowance of a major part of the 1959 net operating loss. On this issue, we agree with the tax court that the taxable periods in 1957, and the taxable year 1958, were open tax periods as of February 26, 1965, the date on which the statutory notices of deficiencies were mailed in all of the cases. Consequently, the appellant was not barred from making the determination of the tax deficiencies which resulted in the filing of the petitions in these cases. Additionally, appellees argue that since 1959 was a closed year, that the appellant is barred from making recomputations of the amount of income or loss, for 1959 of any of the affiliated corporations whose income or loss was reported in the 1959 consolidated return for the purpose of making determinations of

the amount of any allowable net operating loss carrybacks from 1959. Their reliance on Edward G. Leuthesser, 18 T. C. 1112 (1952) is misplaced. Much more in point is State Farming Co., 40 T.C. 774 (1963), which considers a similar issue and holds against appellees' contentions. Also in point is Phoenix Coal Co. v. Commissioner of Internal Revenue, 231 F.2d 420 (C.A.2, 1956); Commissioner of Internal Revenue v. Van Bergh, 209 F.2d 23 (C.A.2, 1954). In these circumstances, 26 U.S.C. § 6501 does not operate as a bar to the appellant's. claims.

In view of our disposition of the main issue, we find it unnecessary to speak on other questions presented in the briefs.

The problems presented by appellees' cross-appeal and the computations to be made on the remand should first have the attention of the tax court or the Commissioner.

### Conclusion

If equitable principles were available in the decisional process construing tax law, we would not hesitate to utilize the general principles expressed in Lemon v. Kurtzman, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973). Unfortunately, this very worthwhile instrument of common law is not to be found in the chest of tools which we are required to use in the disposition of Internal Revenue cases. Even the question of intent has been removed from the area in which we are here confined.

The judgment of the tax court is vacated and the cause remanded for further proceedings in conformity with this opinion.

KILKENNY, Circuit Judge (concurring):

It is with great hesitation and considerable reluctance that I join in the foregoing opinion. If logical support could be found in the adjudicated authorities, I would introduce into tax law, under circumstances such as these, a principle of equity which would not permit the revenue gathering branch of our government to take advantage of a taxpayer's well intentioned reliance on the action of another branch. Unfortunately, I am unable to apply to our facts the principles expressed in United States v. Lazy F. C. Ranch, 481 F.2d 985 (C.A.9, 1973).