**CANAL-RANDOLPH CORPORATION, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

No. 77–2265.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 4, 1977.

Decided Dec. 23, 1977.*

George D. Crowley, Richard L. Manning, Chicago, Ill., for plaintiff-appellant.

Myron C. Baum, Acting Asst. Atty. Gen., Robert T. Duffy, Atty., Tax Div., Dept. of Justice, Washington, D. C., Thomas P. Sullivan, U. S. Atty., Chicago, Ill., for defendant-appellee.

---

* On November 18, 1977, we dismissed the appeal for want of a final judgment. After an appeal from a final judgment, the case has been decided without further briefing or further oral argument.

Before FAIRCHILD, Chief Judge, CUMMINGS, Circuit Judge, and CAMPBELL, Senior District Judge.**

PER CURIAM.

In March 1973, taxpayer Canal-Randolph Corporation filed a complaint, supplemented a few months later, seeking the refund of federal income tax and interest payments totaling $305,825.78 (plus statutory interest) for its fiscal year ending October 1, 1964. Count One complained that taxpayer was entitled to deduct from gross income $607,601 in corporate organization expenses, and Count Two asserted that payments of $87,498 to plaintiff's predecessor by Armour and Company and Swift & Company, meat packers, in settlement of litigation should have been taxed as long-term capital gain rather than as ordinary income. A supplemental complaint realleged Count Two with respect to fiscal 1965 through 1969. In all, taxpayer seeks to recover $464,058.99 plus interest from the United States.

The parties subsequently filed a stipulation of facts, together with numerous exhibits stipulated to be "true and correct copies of the original documents." The contents of these documents may be summarized as follows: Taxpayer is a Delaware corporation with its principal place of business in Chicago, Illinois, and seeks recovery of federal corporate income taxes for fiscal years ending October 31, 1964, through October 31, 1969. As a result of a November 1, 1964, merger, taxpayer became the successor in interest to United Stockyards Corporation.

The stipulation shows that two issues are raised by this lawsuit: (1) whether United's "organizational expenses" were deductible by United in its federal income tax return for the fiscal year ending October 31, 1964, and (2) whether Armour's and Swift's payments to United during fiscal 1964 and to taxpayer during fiscal 1965 through 1969 are ordinary income or long-term capital gains.

** Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation.

I

A. *Organizational Expenses*

The organizational expenditures stem from actions of John DeWitt, United's principal organizer, who incorporated United in May 1936. In August 1936, he agreed with Swift & Company to purchase certain capital stock of stockyard companies and to assign that stock purchase agreement to United. He assigned the stock purchase agreement to United in September 1936.

United agreed to reimburse DeWitt for certain of his expenditures on its behalf and agreed to issue him 71,500 shares of its common stock in return for certain considerations running from DeWitt. United's common stock was offered to the public at $8 per share.

The Government does not presently dispute that United's organizational expenses totaled $607,601,[1] consisting of the following:

1. United's payment to DeWitt of $30,307.

2. United's payment to its directors for organization meetings of $1,544.

3. United's issuance to DeWitt of 71,625 shares of its common stock which taxpayer values at $573,000 ($8 per share).

4. Additional expenditures to other individuals totaling $2,750.

In July 1964, United and taxpayer entered into a merger agreement. In October 1964, United organized UST Corporation and transferred all its assets (subject to all liabilities) to UST in exchange for all UST's stock. In October and November 1964, United obtained certificates of withdrawal from the eight states where it conducted business, and UST obtained certificates of qualification to do business in those states. The merger of United into taxpayer was

1. In case we should remand the first issue, the Government has reserved the right to challenge this amount (Br. 18).

effective on November 1, 1964. Prior thereto, taxpayer had owned 79% of United, whose only asset immediately prior to the merger was all of UST's outstanding stock, whereas UST owned all of the assets previously owned by United. Effective with the merger, taxpayer acquired all the outstanding stock of UST.

### B. *Payments Received from Armour and Swift*

In March 1893, Fort Worth Stockyards Corporation was incorporated as a West Virginia corporation. In January 1902, Fort Worth entered into agreements with Armour and Swift to convey tracts of land to them for the purpose of establishing packing houses adjacent to Fort Worth's Stockyards. The agreements provided that all animals slaughtered on those premises of Armour and Swift "shall pass through the .stockyards of [Fort Worth] and [Armour and Swift shall] pay the customary yardage and other charges thereon."

After its incorporation in 1936, United acquired, *inter alia*, the two-thirds interest in Fort Worth that Armour and Swift had acquired pursuant to the 1902 agreements, and in May 1944, Fort Worth sold all of its assets to United which continued Fort Worth's operation as a division of United.

Armour and Swift stopped paying the yardage fees to United on March 15, 1958. This prompted United to file a lawsuit against Armour in a Texas court two months thereafter. In that lawsuit United complained that since March 1958 Armour had been taking livestock directly into its packing plant without passing the animals through United's predecessor's stockyards and without paying the customary yardage fees pursuant to the 1902 agreement between Fort Worth and Armour. This Texas lawsuit was dismissed in November 1958 after United entered into settlement agreements with Armour and Swift providing that whenever Armour or Swift brought animals into their packing plants without

passing them through United's stockyards, then Armour and Swift would pay reduced yardage charges to United.

Pursuant to those settlement agreements, Armour and Swift paid United $87,498 in its fiscal year ending October 31, 1964, and paid taxpayer as United's successor the following amounts in its fiscal years 1965 through 1969 respectively: $107,044, $116,724, $106,963, $108,107 and $109,687. These settlement payments have been reported by United and taxpayer as capital gains.

At its stockyard facilities near Fort Worth, Texas, Fort Worth, United and taxpayer successively maintained and operated stockyard facilities for which they charged the seller of livestock a yardage fee. This charge was for the stockyard operator's services, consisting of labor, pens, scales and other facilities, with a set fee for each type of animal charged on a per-head basis.

## II

### A. *The Opinion Below*

Based on the stipulated facts and exhibits, the district court filed a memorandum opinion and order[2] holding that United could not deduct the asserted organizational expenses for the year ending October 31, 1964, on the ground that "organizational expenditures are not deductible in a merger because the rights, franchises and privileges acquired as a result of previous expenditures continued to be of use to the surviving corporation." The court concluded that United's organizational expenses "were clearly capital in nature and as such were assets that continued as part of plaintiff corporation." (Mem. op. 3.)

As to the payments received by taxpayer and United from Armour and Swift during the years in question pursuant to the 1958 settlement, the court concluded that they were ordinary income and not entitled to capital gains treatment, reasoning that these payments came from an interest that taxpayer retained in the land conveyed to

---

2. This memorandum opinion and order are unofficially reported at 77–1 USTC ¶ 9158 (December 23, 1976).

Armour and Swift in 1902. In the alternative, the court concluded that taxpayer had failed to carry its burden of showing what part of Armour's and Swift's payments "were allocable to the transfer of the capital assets." (Mem. op. 6.) Consequently, summary judgment was granted to the Government on both issues. We affirm.

### B. *The Organizational Expenses Were Non-deductible*

As noted above, United incurred $607,601 expenses in connection with its 1936 Delaware incorporation. Taxpayer contends these were "organizational expenditures" within the meaning of Section 248 of the Internal Revenue Code[3] and that they became deductible losses under Section 165(a) of the Code[4] at the time of its 1964 merger with United and were fully deductible in that fiscal year. At oral argument, this contention was only made in rebuttal.

■ It is well established that upon dissolution or liquidation of a corporation, capital expenditures incurred before 1954 are deductible because they are no longer of any value to the business.[5] However, in the case of a merger, pre–1954 organizational expenses are not deductible because the powers, privileges and duties of the merged corporation do not come to an end but are transferred to the surviving corporation. As Judge Aldisert explained in *Vulcan Materials Company v. United States*, 446 F.2d 690, 694–695 (5th Cir. 1971), certiorari denied, 404 U.S. 942, 92 S.Ct. 279, 30 L.Ed.2d 255:

"Recognizing these distinctions, we accept the government's contention that the provision for deduction of capital expenditures upon dissolution of a corporation is not applicable when the corporation becomes a constituent of a surviving

corporation in a merger. The organization and reorganization expenses of the constituent corporations in the case at bar were clearly capital in nature. *These assets were not lost but were continued beyond the corporate existence of the constituent corporations and persisted as capital assets of the surviving corporation.* So construed, the expenses were not deductible. (Emphasis supplied.)"

In arguing for a contrary result, taxpayer relies solely on *Dragon Cement Company v. United States*, 144 F.Supp. 188 (D.Me.1956), reversed on other grounds, 244 F.2d 513 (1st Cir. 1957). There the merged corporation had paid the State of Pennsylvania a $12,000 "stock bonus" pursuant to a state statute requiring such a payment when a corporation increased its stated capital or issued authorized capital stock. This was non-deductible when paid in the 1920's. When the Pennsylvania company merged into the taxpayer Maine corporation in 1951, all rights acquired by the so-called capital stock bonus ceased and the survivor had to pay substantially the same bonus to Pennsylvania again. Because of this peculiar situation, the court permitted the original bonus payment to be deducted as a loss upon the merger. No such special factors are present here that would make the *Dragon Cement* rule applicable.

■ As the Government argues and the taxpayer does not dispute, first, a merger, not a liquidation of United, was the only way the taxpayer could have acquired a 100 percent ownership of United, and second, a merger with United, not its liquidation, was the only way the acquisition of ownership could have been concluded on a tax-free basis because minority stockholders held 21 percent of United's outstanding common stock. Thus taxpayer's attempt to avoid the *Vulcan Materials Company* distinction

---

3. Section 248 permits a corporation to treat its post–1954 organizational expenditures as deferred expenses and allows such deferred expenses to be deducted from taxable income "ratably" over a period of five or more years (26 U.S.C. § 248).

4. Section 165(a) allows as a deduction "any loss sustained during the taxable year and not

compensated for by insurance or otherwise" (26 U.S.C. § 165(a)).

5. *Koppers Company, Inc. v. United States*, 278 F.2d 946, 150 Ct.Cl. 556 (Ct.Cl.1960); *Bryant Heater Co. v. Commissioner*, 231 F.2d 938 (6th Cir. 1956); Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders (3d ed.) ¶ 5.07.

between the tax treatment of mergers and dissolutions by recharacterizing the transaction as a dissolution must fail. Even assuming, as the taxpayer contends, that the relevant issue is not the characterization of the transaction but rather whether the assets of the merged company persist or whether "the organizational structure produced by the organizational expenses is of any value after the particular corporate event" (Reply Br. 7), the fact that United dropped all of its assets into a wholly-owned subsidiary, UST, just before the merger does not call for a different result. Taxpayer acquired the stock of that subsidiary in the merger just as it would have acquired United's generating assets had they remained in United. Through taxpayer's ownership of UST, the assets of United "were not lost but were continued beyond [its] corporate existence * * *." *Vulcan Materials Company, supra,* 446 F.2d at 695. Accordingly, the court below correctly disallowed taxpayer's claimed organizational expense deductions.

### C. The Post–1958 Payments from Armour and Swift Were Ordinary Income

In 1902, Fort Worth conveyed adjacent tracts of land near Fort Worth, Texas,[6] to Armour and Swift in return for their promises to establish packing houses on those tracts. Each agreement also provided that:

"so long as the Stock Yards aforesaid shall continue to be maintained and operated on the property belonging to the first party [Fort Worth], or its successors or assigns, all animals slaughtered on the premises to be conveyed to the second party [Armour or Swift] as aforesaid shall pass through the stock yards of said first party and pay the customary yardage and other charges thereon." ·

In addition, the agreements provided that Armour and Swift would not be charged any more for yardage than the yardage fees Fort Worth charged others.

It is clear from the 1902 agreements themselves that they provided for payment for stockyard services to be rendered by Fort Worth. The stipulation of facts removes any doubt about this factor, for paragraph 40 provides:

"One of the business activities of Fort Worth, United and plaintiff was the maintenance and operation of stockyard facilities for which they charged the seller of livestock a yardage fee. This charge was for the stockyard operator's services consisting of labor, pens, scales and other facilities. It is a set fee for each type of animal and charged on a per head basis."

Since the yardage fees paid to Fort Worth and its successors by Armour and Swift were in payment for stockyard services, they were of course ordinary income to the recipients. Taxpayer's assertion that despite this stipulated definition of yardage fees, the payments are properly characterized as capital gains because they must be related to the transfer of land to Armour and Swift in the initial transactions is belied both by the parties' own characterization of the payment as "*customary* yardage fees" (Stip. ¶ 33) (emphasis supplied) and by the more general proposition that the capital gains provisions in the Internal Revenue Code are to be read narrowly. See *Hansche v. Commissioner,* 457 F.2d 429 (7th Cir. 1972).

As seen, Armour and Swift ceased paying the yardage fees to United in March 1958, causing United to sue Armour. The lawsuit was dismissed in November 1958 after Armour and Swift entered into settlement agreements with United providing that when those packers brought animals into their packing plants without passing them through United's stockyards, they would pay reduced yardage charges to United. Each settlement agreement required United to publish certain prescribed yardage charges for livestock proceeding directly to the Swift and Armour packing houses with-

---

**6.** In addition to transferring the two parcels of land to Armour and Swift, Fort Worth transferred one-third of its capital stock and $300,000 in bonds to Armour and made similar transfers to Swift.

out passing through taxpayer's yards. Swift and Armour were then required to pay the new yardage charges after their effective date and 60% of the prior yardage charges before that effective date.

 As taxpayer recognized, it is "the settled rule that tax classification of settled amounts is determined by reference to the nature of the claim settled" (Br. 11). We so held in *Anchor Coupling Company v. United States*, 427 F.2d 429, 433 (1970), certiorari denied, 401 U.S. 908, 91 S.Ct. 866, 27 L.Ed.2d 806 and *Clark Oil and Refining Corp. v. United States*, 473 F.2d 1217, 1220 (1973). While those cases determined the ordinary versus capital nature of settlement proceeds from the viewpoint of the payor, the rule is the same with respect to amounts received in compromise.[7] Since United's Texas litigation was brought to recover ordinary income in the form of yardage fees, the payments received by taxpayer and its predecessors in compromise of that litigation must also be considered ordinary income.

To avoid the taxing of the Armour and Swift payments as ordinary income, taxpayer asserts that such a ruling would interfere with symmetry in the tax laws on the ground that Armour and Swift must be required to capitalize those payments. However, both at oral argument and in its supplemental brief, the Government has responded that Armour and Swift are entitled to claim ordinary deductions for these payments and presumably do so. Thus our holding that the post-settlement Armour and Swift payments to taxpayer and its predecessors constitute ordinary income is harmonious with the other half of the transaction.[8]

Judgment affirmed.

---

7. *Sager Glove Corp. v. Commissioner*, 311 F.2d 210, 211 (7th Cir. 1962), certiorari denied, 373 U.S. 910, 83 S.Ct. 1298, 10 L.Ed.2d 411; *Carter's Estate v. Commissioner*, 298 F.2d 192, 194 (8th Cir. 1962), certiorari denied, 370 U.S. 910, 82 S.Ct. 1257, 8 L.Ed.2d 404; *Commissioner v. Murdoch*, 318 F.2d 414, 416 (3d Cir. 1963), certiorari denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111.

8. Because of our decision that the Armour and Swift payments in question were in lieu of payment for stockyard services and therefore must be treated as ordinary income to taxpayer and its predecessors, we will not consider the correctness of the district court's holding that the payments were ordinary income from an interest that Fort Worth retained in the conveyed land. Nor will we consider the district court's alternative holding that the payments must be considered ordinary income because taxpayer failed to carry its burden of designating what portions thereof are capital gains.