Brian L. NAHEY and Carol J. Nahey, Petitioners–Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent– Appellee.**

### No. 99–1149.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 13, 1999.

Decided Nov. 17, 1999.

Rehearing and Rehearing En Banc Denied Jan. 28, 2000.

---

Robert A. Schnur (argued), Michael, Best & Friedrich, Milwaukee, WI, for Petitioners–Appellants.

Donald J. Tobin (argued), David I. Pincus, Department of Justice, Tax Division, Appellate Section, Washington, DC, George W. Bezold, Internal Revenue Service, Milwaukee, WI, William F. Hammack, Internal Revenue Service, Office of Regional Counsel (Midstates), Dallas, TX, for Respondent–Appellee.

Before POSNER, Chief Judge, and CUDAHY and KANNE, Circuit Judges.

POSNER, Chief Judge.

This appeal from a decision by the Tax Court against the taxpayers, Brian Nahey and his wife, presents a question that one might (wrongly) have supposed resolved long ere now: if a legal claim for lost corporate income is sold as part of the sale of the corporation, and is later settled, are the proceeds of the settlement ordinary income or capital gain? The Tax Court held they were ordinary income. 111 T.C. 256, 1998 WL 731580 (1998).

Wehr Corporation, a manufacturer of industrial equipment, sued Xerox Corporation for damages arising from Xerox's alleged breach of a contract with Wehr to sell it a computer system that would satisfy all of Wehr's data-processing needs. The suit charged fraud as well as simple breach of contract and sought lost profits. Damages in excess of $5 million (including punitive damages) were claimed. Xerox counterclaimed for the unpaid portion of the contract price, some $650,000. While the suit was pending, the majority shareholder in Wehr offered to sell the company to Brian Nahey, its president, for $100 million. The sale took the form of a leveraged buyout (meaning that the assets of the company were pledged to secure a loan that provided the purchaser with the funds necessary to pay the purchase price) by two subchapter S corporations formed and owned by Nahey. (His wife is a party to this litigation only because the couple filed a joint return.) For tax purposes, a subchapter S corporation is identical to its shareholders, so we'll refer to Nahey's two S corporations simply as "Nahey." In allocating the $100 million purchase price of Wehr across Wehr's specific assets, an accounting firm hired by Nahey assigned no value to the suit against Xerox, regarding it as too speculative to be valued.

The sale of Wehr to Nahey took place in 1986. Six years later, the suit (now Nahey's) against Xerox was settled. Xerox agreed to pay Nahey $6 million and to dismiss its counterclaim. Nahey concedes that if Wehr hadn't been sold, and if it had settled its suit against Xerox on the same terms that Nahey did, the entire settlement price of $6 million would have been taxed to Wehr as ordinary income rather than as a capital gain because the amount received in the settlement would have replaced ordinary income of which Xerox had deprived Wehr. *Alexander v. Commissioner*, 72 F.3d 938, 942–44 (1st Cir.1995). (The rule is arbitrarily different in the case of suits for personal injuries; only punitive damages are taxable in such cases even if the judgment or settlement is mainly for lost earnings that would have been ordinary income if not lost because of disability caused by the defendant's wrongdoing. 26 U.S.C. § 104(a); see *O'Gilvie v. United States*, 519 U.S. 79, 86, 117 S.Ct. 452, 136 L.Ed.2d 454 (1996); 1 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates, and Gifts* ¶ 13.1.4 (3d ed.1999).) If the settle-

ment proceeds had replaced a capital gain, they would have been taxed as a capital gain. *Anchor Coupling Co. v. United States*, 427 F.2d 429, 433–34 (7th Cir.1970). That is all that *Anchor Coupling*, on which Nahey relies, held, and it doesn't help him since the origin of his claim was a claim to ordinary income, not to a capital gain.

It is true that when a taxpayer sells a capital asset, the income he receives from the sale is a capital gain. 26 U.S.C. §§ 1221, 1222. And we may assume that the suit against Xerox was a capital asset of Wehr and was acquired together with Wehr's other assets in the purchase of the corporation by Nahey. A capital asset is "property held by the taxpayer," 26 U.S.C. § 1221; *Arkansas Best Corp. v. Commissioner*, 485 U.S. 212, 217–18, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988), and while there are exceptions in section 1221 none of them embraces legal claims, although there is some authority for refusing to classify a right to ordinary income as a capital asset, see *id.* at 217 n. 5, 108 S.Ct. 971, and Wehr's claim against Xerox could be so characterized. That is why we are merely assuming that a sale of the claim would have produced a capital gain, rather than ordinary income, to Wehr. For the sake of completeness we add that, on this assumption, the fact that the accountants declined to value this asset because it was speculative would not undermine its character as a capital asset; it would merely give it a zero basis.

 But even if the sale of the suit would have produced capital gain (or loss) to the seller, the purchaser, when he prosecuted the suit to judgment and collected the judgment, or when he settled the case and received the proceeds of the settlement, would be taxable on the net gain at the ordinary-income rate. *Ogilvie v. Commissioner*, 216 F.2d 748 (6th Cir.1954) (per curiam). This is critical because Nahey did not sell the suit; he prosecuted it to settlement himself. The settlement proceeds were therefore ordinary income to him. A settlement, or equally a litigated judgment, resembles a sale because it extinguishes the plaintiff's claim. But our hypothetical example shows the difference between assigning and enforcing a legal claim. If a settlement or judgment were the sale of an asset, then had Wehr not been sold to Nahey, but had instead obtained the settlement with Xerox itself, the proceeds would (we're assuming) be a capital gain to Wehr—yet Nahey concedes that they would be ordinary income to Wehr. The concession is compelled by the principle that "the [tax] classification of amounts received in settlement of litigation is to be determined by the nature and basis of the action settled, and amounts received in compromise of a claim must be considered as having the same nature as the right compromised." *Alexander v. Commissioner, supra*, 72 F.3d at 942.

To nail this point down, let's suppose Wehr had owned a $1,000 face-amount coupon bond due in 1992 and paying 5 percent annual interest, and the accountants had valued it at $1,000 in the sale of Wehr's assets to Nahey. Between 1986 and 1992, Nahey would have clipped the coupons and received interest of $50 per year ($500 in total) taxable as ordinary income. Then in 1992 he would have cashed in the bond for its face amount, a nontaxable return of principal. Compare that to a variant of this case in which the accountants value the suit against Xerox at $1 million. Then $1 million of the $6 million would have been the cost of the asset to Nahey and would be deducted from the proceeds of the settlement in computing Nahey's income from the settlement. The balance of $5 million would be ordinary income, just like the interest on the bond. It shouldn't make a difference that Wisconsin law (the governing law in the Xerox case) cut off Nahey's right to recover for Wehr's lost profits as of the date of the sale of the corporation to him, while in the case of the bond the interest is received after the acquisition. The proceeds of the settlement were received after the settlement, just as the interest on the bond was re-

ceived after the bond was purchased. The proceeds of the settlement represented overdue ordinary income, but that didn't make it a capital gain. In both cases, what was transferred as part of a corporate acquisition was an asset that yields ordinary income, an asset that the purchaser as it were "milks" for that income rather than selling the asset.

Lest the foregoing analysis seem too formalistic for some tastes, we add that we cannot find any practical reason for why the tax treatment of the proceeds of a suit should change merely because of an intervening change in ownership. Recall the taxpayers' concession that if Wehr had obtained the settlement the proceeds would have been taxable to Wehr as ordinary income, not as a capital gain. Recall too that if Wehr had assigned the suit to someone else, that someone else would have had to pay tax on the net proceeds from any settlement or judgment (net, that is, of the price of the assignment) at ordinary-income rather than capital-gains rates. Why should it make a difference that the assignment was packaged with a sale of other assets (the rest of Wehr's assets) as well? *Canal–Randolph Corp. v. United States*, 568 F.2d 28, 30, 33 (7th Cir.1977) (per curiam), assumes that it makes no difference, consistent with the principle that a merger or other corporate acquisition does not alter the tax status of the assets involved in it. E.g., *United States v. Hilton Hotels Corp.*, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970).

The only effect of permitting the assignment to change the tax classification of the eventual proceeds would be to give an owner of legal claims an incentive to spin them off into a new corporation and sell the corporation, rather than selling the claims directly. The attempt to obtain favorable tax treatment for the purchaser (and hence a higher purchase price) by this route might be thwarted by the "substance over form" doctrine, see, e.g., *Yosha v. Commissioner*, 861 F.2d 494, 497–98 (7th Cir.1988), but why invite that compli-

cation? Why create an added incentive for corporate reorganizations (have we a shortage of them?), which would be the consequence of the rule for which the taxpayers contend in any case in which a corporation has substantial assets in the form of legal claims the enforcement of which would yield ordinary income to the corporation.

Sometimes when a company is sold, the seller retains some or all of its legal claims (more commonly, its legal liabilities, as in *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1424 (7th Cir.1993)), for example by spinning off the claims into a newly formed corporation, because the purchaser may not be able to form a good idea of their merits or may fear the contingent liabilities that the prosecution of a claim often entails—remember Xerox's counterclaim, which depending on the court's rulings might have ended up being worth more than Wehr's claim. Why complicate and distort the business judgment of the parties as to whether to retain or assign legal claims by creating a tax incentive to assign them?

In an effort to bring himself within *Anchor Coupling*, Nahey argues that the claim which was settled was capital in origin, the origin being the LBO. But that is just a conclusion. It is more sensible, for the reasons just explained, as well as fully compliant with the legal formalities, to regard the LBO as merely an intermediate transaction between the original claim, which was to recover ordinary income of which Wehr had been wrongfully deprived, and the settlement of that claim after its transfer to Nahey.

■ It is desirable that rules of taxation be simple and that they be neutral, in the sense of not influencing business judgments except when the purpose of a particular provision of tax law is to influence behavior, which is not contended to be the case here. Judged by this twofold standard the Tax Court's decision is sound; a corporate acquisition should not affect the tax treatment of any claims that are trans-

ferred in the acquisition. Against this the taxpayers point to cases in which the government successfully argued that a deduction taken with respect to an asset acquired as part of a corporate acquisition was a capital loss. The leading case is *Arrowsmith v. Commissioner*, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952), but as explained in *United States v. Skelly Oil Co.*, 394 U.S. 678, 685, 89 S.Ct. 1379, 22 L.Ed.2d 642 (1969), all it stands for is the unexceptionable proposition that "if money was taxed at a special lower rate when received, the taxpayer would be accorded an unfair tax windfall if repayments [of that money] were generally deductible from receipts taxable at the higher rate applicable to ordinary income." See also 2 Boris I. Bittker & Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* § 52.1.9, p. 52–19 (2d ed.1990). That proposition underlies the Tax Court's decision in this case, which merely requires that the tax classification of a legal claim remain unaltered through transfer of the claim whether by assignment or as an incident to a corporate acquisition or other reorganization.

Suppose that Nahey had sold the suit against Xerox rather than prosecuting it and had incurred an expense of $10,000 in negotiating the sale, and that the gain on the sale was taxable at capital-gain rates. He would not be permitted to deduct that expense from ordinary income; he would have to deduct it from the sale price and thus reduce his capital gain rather than his ordinary income. *Woodward v. Commissioner*, 397 U.S. 572, 578, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970). In some of the cases that Nahey cites, the court may have misclassified an expenditure (he points chiefly to *Pacific Transport Co. v. Commissioner*, 483 F.2d 209 (9th Cir.1973) (per curiam)), and treated an ordinary expense as a capital one. If so (which we needn't decide), those cases are incorrect; but there is no principle that an incorrect decision creates a right in a taxpayer to whom that decision has never been applied. Should the government ever claim that the legal expenses incurred by Nahey in obtaining the settlement were capital rather than ordinary—a contention the government's lawyer disclaimed at argument—the Tax Court will be required to reject the contention.

Nahey tries to fit the case into the "open transactions" doctrine, which in its simplest version allows a person who sells property in exchange for a stream of payments contingent on the profits generated by the property to treat the stream as a capital gain, though it looks like ordinary income. The doctrine is designed for cases in which neither the property nor the contingent mode of payment for it can be valued at the time of the sale, so that the taxpayer cannot be accused of having attempted to transform ordinary income into a capital gain; he took the capital gain in the only form that was feasible. 2 Bittker & Lokken, *supra*, § 52.1.9, p. 52–18. The doctrine presupposes that if the property could have been sold for a definite sum, that sum would have been taxable as a capital gain, not ordinary income. Had Wehr sold its claim against Xerox (whether directly or through a corporate reorganization) to Nahey in exchange for a "cut" of any judgment or settlement proceeds, and if—the question we left open earlier—the sale of a legal claim to ordinary income can ever yield a capital gain rather than ordinary income to the seller, then conceivably Wehr could have treated that "cut" when received as a capital gain. But the issue is *Nahey's* tax liability, and to that the open transactions doctrine is irrelevant.

AFFIRMED.

CUDAHY, Circuit Judge, concurring.

I write separately because, although there is much to support the majority opinion, there is considerable to throw it in doubt. And I am troubled that it ignores or excludes whole lines of authority. For example, the majority flatly rejects such cases as *Pacific Transport Co. v. Commissioner*, 483 F.2d 209 (9th Cir.1973), where

the government successfully argued that a payment made by a parent corporation in discharge of a contested tort liability was not an ordinary loss and thus currently deductible. The tort claim in question was first asserted against a subsidiary corporation and necessarily assumed by the parent corporation upon liquidation. The Ninth Circuit held that the loss should have been capitalized and added to the parent's basis in the assets acquired from the subsidiary. *Pacific Transport* is on all fours with the present case except that it involves the expense side rather than the income side. *Arrowsmith v. Commissioner*, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952), involving payment of a judgment after a corporate liquidation, is to the same effect and the majority's effort to distinguish it merely points to the unusual inequity of a contrary outcome. Nonetheless, the principles underlying *Arrowsmith* are the same as those argued by the taxpayer here. For, in *Arrowsmith*, what the majority calls an "intermediate transaction" determined the tax treatment of the payment of a judgment.

At oral argument, the panel asked questions of government counsel reflecting its concern that the government, after successfully arguing for capital treatment in cases like *Pacific Transport* involving the characterization of *expenses*, would continue to fight for ordinary income treatment when the issue involved the characterization of *income*. To no one's surprise, government counsel refused to represent that in the future the government would accept ordinary expense treatment when the shoe was on the other foot. In fact, government counsel's bottom line was "I don't think it's clear how the IRS would treat it if [Nahey] had paid out money.... I can't speak for the IRS." But this Court has, in related contexts in the past, aspired to treat settlement expenses and settlement income symmetrically. *See e.g. Canal–Randolph v. United States*, 568 F.2d 28, 33 (7th Cir.1977). In fact, in *Canal–Randolph* government counsel assured us that in that case at least the IRS would aim for symmetry even at a cost in revenue. But perhaps at this point the cause of symmetry has waned.

It may therefore be a little unrealistic and a little unfair to deny taxpayers the benefit of cases holding, in circumstances analogous to the present case, that expenses must be capitalized. It is *unrealistic* because we seem to entertain the hope that our result is so "simple" and so "neutral" that other courts will follow it (presumably in preference to their own precedents) equally in income and in expense cases. In the same vein, we hope that the government will be so persuaded by our analysis that it will cease taking a position in all kinds of cases that merely maximizes the revenue—whatever its logical inconsistencies. I think it is unrealistic—even naive—for us to have such expectations. It is *unfair* because we deny taxpayers the benefit of precedents that support in principle the capitalization of income, even though they deal immediately with issues of loss and expense.

Another consideration much esteemed by the government but a dubious contributor to simplicity and neutrality is the presence or absence of a sale or exchange. For the difference between a sale or exchange of a capital asset and its disposition by other means, such as by settlement, has never been simple or neutral. The congressional *purpose* in the distinction between capital gain and ordinary income seems to have been to distinguish "between recurring receipts such as salaries, wages, interest, rents, dividends, royalties, and the like on one hand, and the nonrecurrent realization of *the appreciation in the value of property* on the other." Stanley S. Surrey, *Definitional Problems in Capital Gains Taxation*, 69 Harv. L. Rev. 985, 1003–4 (1956) (emphasis supplied). Courts have seized on "sale or exchange" language to limit the conversion of ordinary income into capital gains. The other side of the coin is that the "presence of a 'sale or exchange' requirement produces

incongruous results when an admitted capital asset is disposed of by means other than sale or exchange...." *Id.* at 1007. It is hard to see how taxing Nahey's gain as ordinary income is a simple or neutral rule when, if he had sold the claim for the settlement amount, he would have realized capital gain.

The majority says that the settlement of the lawsuit here yields ordinary income because the amount received in settlement replaced ordinary income of which Xerox had deprived Wehr. But the government seems to prefer the rationale that a settlement cannot generate a capital gain because a settlement is not a sale or exchange. However, if we could get beyond this linguistic hurdle, in the hands of Nahey the settlement could arguably represent a reduction in Nahey's cost basis in the other assets acquired from Wehr (a mirror image of *Pacific Transport*), not a replacement of ordinary income.

The majority has also adopted the principle that a corporate sale is "merely an intermediate transaction between the original claim, which was to recover ordinary income of which [the original taxpayer] had been wrongfully deprived, and the settlement of that claim after its transfer to [a new taxpayer]." This principle has a ring of clarity and simplicity about it, but it did not control in either *Arrowsmith* or *Pacific Transport* or in like cases, where an "intermediate transaction" is the key to the result. Perhaps this is not surprising because an "intermediate transaction" generally changes the identity, circumstances and economic function of the taxpayer in ways that ought to be recognized in the analysis. For example, if a car appreciates in the hands of a car dealer, the gain is generally ordinary. 26 U.S.C. § 1221(1). If it appreciates in the hands of a customer to whom the car has been sold, the gain is generally capital.

The problematic effort of the majority to make this puzzle appear simple is best illustrated by its bond analogy. Of course, coupon interest on a high-quality bond, periodically paid at prescribed intervals, is ordinary income, no matter how many corporate transfers have preceded the clipping of the coupons. But, unlike the claim in the present case, bond interest is earned almost contemporaneously with its receipt. In fact, in the example given in the majority opinion it is *earned* in the hands of the successor corporation. This is not unlike the yardage earned by the purchaser after the transfer in *Canal–Randolph*. This is unlike the claim in the instant case where whatever is earned in the settlement reflects legal relations established before the transfer. In the case of bond interest, there is no reason to look at events before the transfer, since the interest is a wholly post-transfer phenomenon.

A junk bond might furnish a more helpful analogy. This is a bond that could be valued at the time of corporate transfer far below par because of the risk of non-payment of interest or of non-recovery of capital. When the bond later is redeemed at face value in the hands of the transferee the part of the gain attributable to the time value of money would be treated as ordinary income and the balance as capital gain. The increase in value of a junk bond when redeemed, reflecting a reward for the transferee's successful risk-taking, might be analogized to the settlement of the "speculative" lawsuit in the instant case.

Given all these important considerations, I think we must give proper weight to authoritative decisions like *Pacific Transport*, which require taxpayers to capitalize losses and which argue for symmetrical treatment on the income side. To ignore this authority adds to the mistaken impression that this is an easy case. It is far from an easy case, and efforts to make it into one may do more harm than good. My observations about various aspects of the majority opinion indicate why a strong tilt toward the tax collector is unwarranted. The arguments and authorities on both sides are so close to equipoise that a decision is difficult. To resolve the matter,

I think that some deference is due the Tax Court, which deals regularly with the issues that trouble us. I, therefore, despite substantial doubt, elect to adopt the same outcome as the majority, even though I seriously question important aspects of its analysis.