MANION, Circuit Judge,
dissenting.
After several years of time and money invested in developing a unique process of making and freezing pre-cooked sausage, C & F Packing successfully patented what became the trade secret that is the focal point of the tax issue before us. The question is straightforward: whether the settlement proceeds received by C & F should be classified as capital gain or ordinary income. The court agrees with the Tax Court’s decision that they should be classified as ordinary income. I disagree and conclude that the settlement proceeds *578 should be classified as capital gain. And so, I respectfully dissent.[1]
I agree with the court and the Tax Court on the rule that “[t]he classification of amounts received in settlement of litigation is to be determined by the nature and basis of the action settled.” Nahey v. Commissioner, 196 F.3d 866, 868 (7th Cir.1999). But based on the record before us, I disagree with the Tax Court’s conclusion that the nature of the claim brought by C & F against Pizza Hut is a claim for lost profits. Rather, it is a claim for the value lost when the trade secret was misappropriated by Pizza Hut.
When the litigation began, C & F brought claims against both Pizza Hut and its competitor, IBP. Most of the claims were dismissed for reasons not relevant here, but two claims remained viable: a claim of trade secret misappropriation against IBP for unlawfully using C & F’s trade secret when it processed and sold sausage to Pizza Hut, and a claim of trade secret misappropriation against Pizza Hut for wrongfully disclosing C & F’s trade secret.
Although the district court initially dismissed the claim against Pizza Hut, the claim against IBP was successful, with a jury awarding C & F $10.9 million in damages. When it came time to calculate its taxes, C & F determined that approximately $2.86 million of the total award corresponded to the amount of profits that C & F had lost by IBP’s trade secret misappropriation. In other words, had IBP not been using C & F’s trade secret, Pizza Hut would have bought more sausage from C & F instead of IBP, and $2.86 million corresponded to the profits from these lost sales with Pizza Hut. Thus, C & F treated that portion of the jury award as ordinary income and treated the remainder as capital gain.[2] The Commissioner apparently had no objection to this characterization. On appeal, the D.C. Circuit reversed the dismissal and reinstated C & F’s trade secret misappropriation claim against Pizza Hut. With only the trade secret misappropriation claim against Pizza Hut remaining, Pizza Hut then settled for $15.3 million. The Tax Court concluded that the settlement proceeds were for lost profits.
But C & F did not lose profits to Pizza Hut — it lost them to IBP when Pizza Hut transferred the business to IBP. What C & F did lose to Pizza Hut was value to its trade secret when Pizza Hut misappropriated it. In light of the IBP verdict, the profits lost to C & F from purchases that Pizza Hut made with IBP instead of C & F have already been accounted for in the jury award, and any additional money recovered from Pizza Hut cannot correspond to money from lost sales. In its opinion, the Tax Court dismissed this issue, saying that C & F could have also lost profits attributable to Pizza Hut that were not attributable to IBP. Nothing in the record supports that finding: instead, C & F’s case is limited to Pizza Hut giving the secret to one competitor, IBP; C & F’s lost profits went to IBP from IBP’s sausage sales to Pizza Hut; and these profits *579 were recovered as part of the jury award against IBP.
The Tax Court is wrong because it misread the complaint. In the complaint, after describing the elements of its trade secret misappropriation claim against Pizza Hut, C & F alleged that “[a]s a result, C & F has been damaged, and has suffered, among other things, lost profits, lost opportunities, operating losses and expenditures.” [Tax Court decision, Appendix p. 32] From this one phrase of “lost profits,” the Tax Court concluded that C & F was only seeking lost profits against Pizza Hut. This is an incorrect way of reading the complaint. Recall, the complaint when first filed was against Pizza Hut and IBP. The nature of the claim that C & F was bringing against Pizza Hut was that Pizza Hut had wrongfully acquired and then disclosed a trade secret to C & F’s competitor, IBP. This undoubtedly damaged C & F’s property interest in the trade secret.[3] Accordingly, in the complaint, the phrase “lost profits” was part of a non-exclusive list describing ways C & F had been injured by Pizza Hut’s trade secret misappropriation. But this phrase “lost profits” did not negate the fact that C & F’s trade secret had been severely damaged and that C & F was also seeking compensation for this damage. The Tax Court erroneously discarded the neighboring phrase “lost opportunities” which easily includes, for example, the lost opportunity to negotiate a transfer of the secret process to another pizza giant after Pizza Hut cut C & F off. The Tax Court was clearly wrong to conclude that the claim against Pizza Hut could only be for lost profits and that it wasn’t also to compensate the injury to its trade secret, when the only profits lost were those transferred to IBP. And as discussed above, at the time of the settlement, C & F had already received compensation for its lost profits by means of the jury award.
Although the Tax Court concluded that Pizza Hut paid the settlement to C & F for lost profits, there is nothing in the record indicating that the parties understood the settlement proceeds to be a payment equivalent to C & F’s lost profits — there are no calculations indicating the equivalency between C & F’s lost profits and the settlement amount. Instead, Pizza Hut paid the settlement proceeds to C & F in an agreement to settle all past, present, and future claims against Pizza Hut, in typical boilerplate language contained in any litigation-ending release agreement. And the only issue in that final phase of the litigation following the IBP verdict was the damage to the trade secret asset.
Other than its reliance on the single “lost profits” reference in the complaint, the Tax Court does not cite to anything in the record which supports the position that C & F’s remaining claim against Pizza Hut was for lost profits. In fact, the record contained direct testimonial evidence to the contrary, which the Tax Court rejected *580 as unreliable based on its reading of the “lost profits” phrase.
In sum, the “nature and basis” of the trade secret misappropriation claim, at the time when Pizza Hut entered into its settlement agreement following the IBP verdict, was a claim seeking compensation for the substantially diminished value inflicted upon the trade secret. See Nahey, 196 F.3d at 868. And since a trade secret is a capital asset, the settlement should be characterized as capital gain.
I respectfully dissent.

. On appeal, C & F brings two arguments. With respect to C & F’s second argument, I agree with the court that the Tax Court correctly ruled that the settlement payment did not constitute the sale of a capital asset. Clearly there was no sale, and it would be difficult to equate the value of an arm’s-length sale with an asset that was unilaterally misappropriated. It is with respect to C & F's primary argument that I part ways with the court.

. Because most of the $10.9 million jury award was first disbursed to attorneys and shareholders, C & F ultimately received only about $4 million. C & F then reported to the Commissioner its income in proportionate amounts — about $1 million in ordinary income and $3 million in capital gain.

. The Commissioner makes the argument that C & F's trade secret did not lose value because it was not publicly distributed. But the fact that the disclosure was not public is not relevant; the value of the trade secret was still damaged by the disclosure to IBP because C & F had lost its competitive advantage to IBP. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1012, 104 S.Ct. 2862, 81 L.Ed.2d 815 (U.S.1984) ("With respect to a trade secret, the right to. exclude others is central to the very definition of the property interest. Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data.... The economic value of that property right lies in the competitive advantage over others that [the holder of the trade secret] enjoys by virtue of its exclusive access to the data, and disclosure or use by others of the data would destroy that competitive edge.”)