# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-1555

JOSEPH A. FREDA, et al,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

Appeal from the United States Tax Court.
Nos. 12874-07, 16255-07, 16256-07,
16257-07, 16258-07, 16259-07, 16260-07,
16261-07, 16262-07—**Carolyn P. Chiechi**, *Judge.*

ARGUED SEPTEMBER 30, 2010—DECIDED AUGUST 26, 2011

Before FLAUM, MANION, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Sausage manufacturer C&F Packing Co., Inc., brought a variety of claims against its former business partner, Pizza Hut, Inc., in 1993. After a trial, a trip to the United States Court of Appeals for the Federal Circuit, and a lot of legal wrangling, C&F agreed in 2002 to drop its last remaining claim, trade secret misappropriation, in exchange for a $15.3

million payment from Pizza Hut. Closing the book on the long-running lawsuit merely opened a new chapter of legal difficulties for C&F and its shareholders, however. When it received its $6.12 million take-home portion of the settlement, C&F, an S corporation, reported the income to the Internal Revenue Service as long-term capital gain. Its shareholders reported their passed-through pro rata shares of the settlement the same way. The Commissioner of Internal Revenue concluded that the settlement income should have been taxed as ordinary income and issued each of the shareholders (and, in some cases, their jointly filing spouses, whom we will include among "the shareholders") a deficiency notice. The shareholders challenged the determination in the tax court, which agreed with the Commissioner's treatment of the settlement income and ordered deficiency judgments. The shareholders now appeal. We affirm.

## I. Background

C&F is an Illinois-based meat processing company. In the early 1980s, C&F developed a process for making and freezing pre-cooked sausage that had the appearance and taste of home-cooked sausage. C&F applied for and obtained a patent protecting its new process. C&F treated as trade secrets all subsequent refinements to the process; we use the term "C&F process" to refer to the process and related trade secrets.

In 1985, one of C&F's long-time customers, Pizza Hut, expressed an interest in using sausage made pursuant to the C&F process in its outlets nationwide, which

would result in purchases of at least 200,000 pounds per week. The catch was that C&F had to agree to share the C&F process with Pizza Hut's other sausage suppliers so that Pizza Hut could offer its customers a uniform product. Later that year, Pizza Hut and C&F signed an agreement pursuant to which C&F disclosed to Pizza Hut information relating to the C&F process, and Pizza Hut promised to keep mum about those details. C&F also entered into separate confidential licensing agreements with several of Pizza Hut's other suppliers, disclosing its C&F process in exchange for promises of confidentiality and licensing fees.

Pizza Hut faltered on its end of the bargain: it failed to buy sufficient quantities of sausage from C&F and allegedly—it has never admitted wrongdoing—divulged crucial information regarding the C&F process to IBP, Inc., another meat processing company with whom C&F had not signed a confidentiality or licensing agreement. IBP replicated the C&F process, set its prices below C&F's, and began selling large quantities of sausage to Pizza Hut. Pizza Hut bought less and less sausage from C&F, and C&F suffered financially. C&F eventually filed suit against both Pizza Hut and IBP in the Northern District of Illinois in 1993. In its second amended complaint, C&F alleged, *inter alia*, that Pizza Hut "misappropriated [its] trade secrets by, among other things: (a) acquiring the trade secrets through fraudulent misrepresentations and omissions, and (b) disclosing and using such trade secrets, after notice, without express or implied consent of C&F." "As a result," the complaint continued, "C&F has been damaged, and

has suffered, among other things, lost profits, lost opportunities, operating losses, and expenditures." C&F sought compensatory and punitive damages as well as injunctive relief and attorneys' fees in connection with its trade secret misappropriation claim.

The district court dismissed all the counts against Pizza Hut, including the claim of trade secret misappropriation. C&F's trade secret misappropriation claim against IBP proceeded to trial, however, and a jury awarded C&F $10.9 million in damages. The district court awarded C&F an additional $5 million in pre-judgment interest. Both C&F and IBP appealed to the Federal Circuit (one of the claims at issue was a patent claim involving the patent for the C&F process, which was ultimately invalidated). The Federal Circuit affirmed the jury's verdict on the IBP misappropriation claim, though it vacated the district court's interest award. IBP promptly paid C&F the $10.9 million judgment. C&F determined that it would have had approximately $2.86 million in additional profits if IBP had not misappropriated its trade secret; it treated that portion of its take-home from the settlement as ordinary income and the rest as capital gain on its 2000 federal income taxes. Its shareholders did the same and met no resistance from the Commissioner.

The Federal Circuit also decided that the district court had erred in dismissing C&F's trade secret misappropriation claim against Pizza Hut. It remanded that claim, the only surviving claim in the suit, back to the Northern District of Illinois. Pizza Hut moved for sum-

mary judgment, but became amenable to settlement after the district court denied that motion. Pizza Hut and C&F settled the trade secret misappropriation claim for $15.3 million in January 2002. The settlement agreement provided for "a lump-sum payment in full and complete discharge and settlement of the Lawsuit and all other past, present, and future claims that could be asserted now or in the future by the C&F Parties and Pizza Hut related to the events or circumstances described in the Lawsuit." After deducting attorneys' fees, expenses, and a sizeable payment to a former shareholder (who redeemed his shares to C&F in exchange for an interest in the suit) from the settlement, C&F walked away with $6.12 million.

C&F characterized the $6.12 million as gain from a "trade secret sale" and reported the entire amount as long-term capital gain on its 2002 federal income tax form. The Schedule K-1s that C&F distributed to the shareholders characterized the settlement proceeds the same way. The shareholders in turn reported their proportionate shares of the settlement as long-term capital gain on their 2002 federal income taxes.

In March 2007, the Commissioner issued notices of deficiency to the shareholders after determining that the $6.12 million settlement was ordinary income, not long-term capital gain. The former is taxed at a higher rate than the latter; some shareholders were assessed deficiencies in excess of $700,000. The Commissioner also determined that the portion of the settlement C&F allocated to the former shareholder—some $3.06

million—should have been reported as income by C&F rather than deducted; the asserted deficiencies reflected this position. The shareholders challenged the deficiency assessments by timely filing petitions with the United States Tax Court. *See* 26 U.S.C. § 6213. Their cases were properly consolidated. After the claims proceeded to trial, the Commissioner conceded that C&F properly deducted the $3.06 million it paid to the former shareholder; the sole issue remaining for the tax court was whether the $6.12 million should have been reported as ordinary income or long-term capital gain.

At the one-day, single-witness trial and in the briefing that followed it, the shareholders raised three arguments in support of their position that the settlement proceeds should be taxed as long-term capital gain. First, relying on *Inco Electroenergy Corp. v. Comm'r*, T.C.M. (P-H) 1987-437, which held that moneys received for injury or damage to capital assets are taxable as capital gain, they argued that the settlement here was payment for damage to C&F's trade secrets, which are capital assets, *see id.*; *Ofria v. Comm'r*, 77 T.C. 524, 541-42 (1981). Second, recognizing that long-term capital gain is defined in terms of the "sale or exchange" of capital assets, *see* 26 U.S.C. § 1222(3), they asserted that the settlement payment represented the culmination of a "sale or exchange" of the trade secrets relating to the C&F process. Finally, looking to 26 U.S.C. § 1234A, which treats as capital gain income attributable to the termination of certain rights or obligations, they contended that Pizza Hut made the settlement payment to terminate C&F's rights under the confidentiality agreement the parties

signed in 1985. The tax court rejected all three arguments and sustained the Commissioner's determination that the settlement proceeds should be taxed as ordinary income. (The deficiencies were recalculated and reduced to reflect the Commissioner's concession.) The shareholders reassert their first two arguments in this appeal, over which we have jurisdiction. 26 U.S.C. § 7482(a)(1).

## II. Discussion

### A. Standard of Review

We review decisions of the tax court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." *Id.*; *see generally Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 307-08 (7th Cir. 2002) (discussing standards of review in such cases). The parties agree that this means that we review conclusions of law de novo and findings of fact for clear error. *See Cole v. Comm'r*, 637 F.3d 767, 773 (7th Cir. 2011). They part ways, however, when it comes to our review of the application of law to facts, or "mixed questions of law and fact." The shareholders advocate for a de novo review, *e.g.*, *Frank Lyon Co. v. United States*, 435 U.S. 561, 581 n.16 (1978); *Bell Fed. Sav. & Loan Ass'n v. Comm'r*, 40 F.3d 224, 226 (7th Cir. 1994), while the Commissioner champions a more deferential clear error review, *e.g.*, *Kikalos v. Comm'r*, 434 F.3d 977, 982 (7th Cir. 2006); *Reynolds v. Comm'r*, 296 F.3d 607, 612 (7th Cir. 2002). This quandary about the

appropriate criterion is a knotty one. *See Wellpoint, Inc. v. Comm'r*, 599 F.3d 641, 644-45 (7th Cir. 2010). Fortunately, we need not unravel it here. "We would affirm under either standard," *id.* at 645, because the shareholders have not carried their burden of proving that the Commissioner's presumptively correct deficiency assessments are erroneous, *see Cole*, 637 F.3d at 773 .

## B. Analysis

The shareholders first "ask this Court to adopt a rule that, as a matter of law, settlement proceeds received as a result of a sole claim for misappropriation of a capital asset are taxed as capital gains." Because C&F's claim had at its center a capital asset, they contend, all compensation C&F (and they) received in settlement of that claim must also be treated as capital in nature.

This broad-brush approach obscures some crucial finer points of the so-called "origin of the claim" doctrine, the underlying principles of which are applicable here. (It also elevates form over substance, which is generally frowned upon in tax jurisprudence, *see, e.g.*, *Frank Lyon*, 435 U.S. at 583-84, and potentially opens the door to exploitation of the beneficial—and exceptional—capital gains tax rate, *cf. Womack v. Comm'r*, 510 F.3d 1295, 1299 (11th Cir. 2007) ("Congress intended ordinary income to be the default tax rate, with capital gains treatment an exception only in appropriate cases.").) The origin of the claim doctrine had its roots in a dispute over legal expenses a taxpayer incurred while defending his income-producing property during a divorce dispute.

*See United States v. Gilmore*, 372 U.S. 39 (1963); *Reynolds*, 296 F.3d at 614. The taxpayer characterized his legal expenses as "business" rather than "personal" in nature because, he asserted, he was conserving his capital assets. The Supreme Court rejected his argument, holding that "the characterization, as 'business' or 'personal,' of the litigation costs of resisting a claim depends on whether or not the claim *arises in connection with* the taxpayer's profit-seeking activities." *Gilmore*, 372 U.S. at 48. While the doctrine in its purest form is not directly applicable here, the principles underlying it long have been. *See, e.g.*, *Canal-Randolph Corp. v. United States*, 568 F.2d 28, 33 (7th Cir. 1978) (per curiam). That is, "the [tax] classification of amounts received in settlement of litigation is to be determined by the nature and basis of the action settled, and amounts received in compromise of a claim must be considered as having the same nature as the right compromised." *Nahey v. Comm'r*, 196 F.3d 866, 868 (7th Cir. 1999) (quoting *Alexander v. Internal Revenue Serv.*, 72 F.3d 938, 942 (1st Cir. 1995)). To determine the "nature" of the "right compromised," the shareholders invite us to look no further than the title of their claim: trade secret misappropriation.

Perhaps in a different case that quick glance could resolve the matter. But trade secret misappropriation, aside from signaling that a capital asset may be in some way implicated, does not tell us very much about the actual nature of C&F's original claim, which can take many forms. *See Restatement (Third) of Unfair Competition* §§ 40, 44-45 (1995) (describing trade secret [mis]appropriation and the many factors that should

be considered in awarding injunctive and monetary relief); *Milgrim on Trade Secrets* § 15.02 (describing varieties of relief available in trade secret litigation). And while the outcome of a suit is not dispositive in making such an assessment, *Wellpoint*, 599 F.3d at 647 (citing *Gilmore*, 372 U.S. at 48-49), "the remedy sought or ordered or agreed to can be a clue to the nature of the claim," *id.* at 648; *see also Sager Glove Corp. v. Comm'r*, 36 T.C. 1173, 1180 (1961) ("The taxability of the proceeds of a lawsuit, or of a sum received in settlement thereof, depends upon the nature of the claim *and the actual basis of recovery*." (emphasis added)), *aff'd*, 311 F.2d 210 (7th Cir. 1962). Where "the recovery represents damages for lost profits, it is taxable as ordinary income. However, if it represents a replacement of capital destroyed or injured, the money received . . . is a return of capital and not taxable." *Sager Glove*, 36 T.C. at 1180. We look to what the settlement payment in question is "in lieu of." *Canal-Randolph*, 568 F.2d at 33 n.8; *see also Milenbach v. Comm'r*, 318 F.3d 924, 932 (9th Cir. 2003) ("When a claim is resolved by settlement, the relevant question for determining the tax treatment of a settlement award is: 'In lieu of what were the damages awarded?' "); *Raytheon Prod. Corp. v. Comm'r*, 144 F.2d 110, 113 (1st Cir. 1944) (same).

Here, the tax court, after reviewing the record and hearing testimony on the matter at trial, found that "Pizza Hut paid the amount at issue to C&F for 'lost profits, lost opportunities, operating losses and expenditures.' " This finding of fact, *see Alexander*, 72 F.3d at 944, which tracks the language of the relief requested in

C&F's complaint and has some support in the trial testimony, is not clearly erroneous, particularly when it is viewed, as it must be, in the light most favorable to the finding, *see Pittman v. Comm'r*, 100 F.3d 1308, 1313 (7th Cir. 1996). Nor is it as narrow as our dissenting colleague appears to believe. *See* Dissent at 20 ("[T]he Tax Court concluded that C&F was only seeking lost profits against Pizza Hut."); *id.* at 21 ("The Tax Court was clearly wrong to conclude that the claim against Pizza Hut could only be for lost profits and that it wasn't also to compensate the injury to its trade secret . . . ."). We agree that a finding that C&F sought only lost profits, or was compensated only for lost profits in the settlement, would be "an incorrect way of reading the complaint." *Id.* at 20. But the way we see it, the tax court did not err when it concluded that the shareholders "failed to carry their burden that [the settlement payment] did not represent damages for lost profits *or other items taxed as ordinary income*." *Freda v. Comm'r*, T.C.M. (CCH) 2009-191 (emphasis added). (The tax court also noted that, even assuming C&F had fulfilled that burden, it had not met its other burden of establishing what portion of the payment at issue should be treated as long-term capital gain for the tax year in question.)

The tax court implicitly recognized that trade secret misappropriation claims—and recoveries associated with them—are rather chameleonic. Injuries caused by trade secret misappropriation can take many forms and may be remedied by many types of relief. *See* 765 Ill. Comp. Stat. 1065 (statute that C&F claimed was violated); Kan. Stat. Ann. § 60-3322 (statute found to apply); *Restatement*

*(Third) of Unfair Competition* § 45; *Milgrim on Trade Secrets* § 15.02. Among these remedies are a variety of damages, including lost profits and royalties, that are properly characterized as ordinary income for tax purposes. The shareholders had the burden of demonstrating that the Commissioner was wrong when he concluded that the settlement payment was in lieu of one or more of these ordinary income streams. They contend that they carried this burden simply by pointing to the fact that the claim was one for trade secret misappropriation. They further argue that the tax court misapplied the origin of the claim doctrine by considering C&F's requests for recovery for its lost profits, opportunities, losses, and expenditures as more than mere metrics by which to measure the damage to its trade secrets.

But unlike the taxpayers in the cases on which the shareholders rely, *Durkee v. Comm'r*, 162 F.2d 184, 186 (6th Cir. 1947), and *Inco Electroenergy*, T.C.M. (P-H) 1987-437, neither of whom ever alleged an entitlement to lost profits, C&F sought profits and other types of monetary recovery that may properly be taxed as ordinary income from the get-go rather than focusing on the damage to or destruction of its capital asset. The shareholders claim C&F was using profits merely as a rough measuring stick for the loss of value to its trade secrets, *see Inco Electroenergy*, T.C.M. (P-H) 1987-437, but C&F, unlike Inco, consistently alleged it was entitled to lost profits as a type rather than amount of damages; "[t]he subject of the possible impact of [the trade secret misappropriation] on [C&F's] sales" did not arise "only

in [C&F's] attempt to place a value on the damage to" the trade secrets, *id.* The factual allegations incorporated into C&F's misappropriation claim highlight vast reductions to C&F's margins, *see* Second Am. Compl. ¶ 40, C&F's financial losses, *see id.* ¶ 42, the disproportionate impact Pizza Hut's conduct had on C&F's total sales, *see id.* ¶ 47, and C&F's inability to "exploit" its C&F process, *id.* ¶ 49. The shareholders did not offer the tax court evidence which undercut the Commissioner's reasonable conclusion that the damages C&F alleged were the main attraction rather than mere placeholders; their sole attempt to do so was (properly) rejected on hearsay grounds. They likewise failed to make any effort to explain why they voluntarily treated some of the money they received for a virtually identical claim (trade secret misappropriation against IBP) as ordinary income if all such claims necessarily net capital gains.[1] Based on the record before it, the tax court did not err in upholding the Commissioner's presumptively correct determination that the settlement was not "in lieu of" a replacement of capital. *Cf. Sager Glove*, 311 F.2d at 212 (similar finding in context of antitrust suit).

   We are similarly unmoved by the shareholders' alternative argument, that the alleged misappropriation and subsequent settlement payment in fact constituted a protracted commercial transaction in which a capital asset held for more than a year was exchanged for

---

[1] When asked about this inconsistency at oral argument, the shareholders' attorney asserted that the judgment from IBP "should have been properly taxed as capital gain."

money. In their view, Pizza Hut "bought" a capital asset when it misappropriated the C&F process, then completed the sale or exchange years later by "paying" C&F with the settlement. *See Lehman v. Comm'r*, 835 F.2d 431, 435 (2d Cir. 1987) (noting that the fact that taxpayer did not receive compensation for alleged sale for more than 16 years did not "militate[ ] against finding that the payment was within [26 U.S.C.] § 1235").

This argument grows out of 26 U.S.C. § 1222(3), which defines as "long-term capital gain" proceeds from the "sale or exchange of a capital asset held for more than 1 year," and 26 U.S.C. § 1235, which provides that "[a] transfer . . . of property consisting of all substantial rights to a patent . . . shall be considered the sale or exchange of a capital asset held for more than 1 year." (The parties agree that trade secrets are analogous to patents for purposes of § 1235. *See Vision Info. Servs., LLC v. Comm'r*, 419 F.3d 554, 561 (6th Cir. 2005); *Pickren v. United States*, 378 F.2d 595, 599 (5th Cir. 1967) ("Secret formulas and trade names are sufficiently akin to patents to warrant the application, by analogy, of the tax law that has been developed relating to the transfer of patent rights, in tax cases involving transfers of secret formulas and trade names."); *see also Milgrim on Trade Secrets* § 11.04 & n.316.) The shareholders contend that Pizza Hut deprived C&F of all the economic value of, and thus almost all of the substantial rights to, its trade secret when it misappropriated the C&F process back in the 1980s. *See* 26 C.F.R. § 1.1235-2(b) (defining "all substantial rights to a patent" as "all rights . . . which are of value at the time the rights to the patent . . . are transferred"); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984)

("Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data."). The only valuable right C&F had left in their view was "the right to pursue a claim against Pizza Hut for unauthorized use or disclosure," which C&F gave up in exchange for the settlement payment in 2002. *See Am. Family Mut. Ins. Co. v. Roth*, 485 F.3d 930, 932 (7th Cir. 2007) (noting that trade secrets, once sold, can no longer be used by the seller).

The facts of the case undermine their position, however. The tax court found that Pizza Hut disclosed the C&F process to IBP in 1989. Four years later, C&F filed suit against both Pizza Hut and IBP. It secured a sizeable jury verdict against IBP for trade secret misappropriation. To achieve such a result, C&F had to have possessed—and exercised—its right to exclude others, not just Pizza Hut, from using or disclosing its protected process. *See Ruckelshaus*, 467 U.S. at 1011 ("With respect to a trade secret, the right to exclude others is central to the very definition of the property interest."); *E.I. Du Pont De Nemours & Co. v. United States*, 288 F.2d 904, 911 (Ct. Cl. 1961) ("No disposition of a trade secret is complete without some transfer of this right to prevent unauthorized disclosure."); *Milgrim on Trade Secrets* § 11.04 ("To qualify as a sale under the [Tax] Code the owner of a trade secret must give the transferee the 'right to use the trade secret' and in addition convey 'his most important remaining right, the right to prevent unauthorized disclosure (and effectively the right to prevent further use of the trade secret by others).'" (quoting *Du Pont*, 288 F.2d at 912)). C&F neces-

sarily retained a rather valuable right associated with its trade secret (at least until technological advances rendered the once-groundbreaking C&F process obsolete), one that was not transferred to Pizza Hut at any point during the 13 years separating the misappropriation from the settlement payment. C&F could not have transferred all substantial rights in its trade secret while simultaneously keeping a $10.9 million right to exclude IBP in its back pocket. "[A] seller that transfers less than all substantial rights to a trade secret generally is not eligible for capital gain treatment." *Milgrim on Trade Secrets* § 11.04.

Moreover, the settlement agreement gives no indication that Pizza Hut believed it was compensating C&F for the sale or even the use of its trade secrets. *See Lehman*, 835 F.2d at 435. It states only that $15.3 million was tendered "in consideration of the dismissal with prejudice of the lawsuit," not in exchange for anything else Pizza Hut previously or concurrently received. Transactions involving the transfer of capital assets must be "in the nature of a sale" to qualify for capital gains treatment. *Milgrim on Trade Secrets* § 11.04; *cf. Helvering v. Hammel*, 311 U.S. 504, 510-11 (1941) (holding that forced sales of capital assets constitute "sales" for tax purposes and emphasizing sale-like characteristics rather than voluntariness of transaction). Here, the tax court expressly concluded that "Pizza Hut did not pay the amount at issue under the settlement agreement for C&F's sale or exchange of the C&F trade secret to Pizza Hut." Without at least some hallmarks of a sale, C&F's transfer to Pizza Hut of its trade secrets should not be considered one for tax purposes.

The tax court rightly concluded that the settlement payment did not represent the final phase of a 13-year-long transfer of a capital asset. Because there was not a complete transfer of all substantial rights, there was no "sale" of a capital asset or long-term capital gain resulting therefrom.

### III. Conclusion

The tax court sustained the Commissioner's determination that the proceeds C&F received from the settlement of its trade secret misappropriation claim should be taxed as ordinary income. This conclusion was neither clearly erroneous nor legally incorrect. We therefore AFFIRM the judgment of the tax court.

MANION, *Circuit Judge,* dissenting. After several years of time and money invested in developing a unique process of making and freezing pre-cooked sausage, C&F Packing successfully patented what became the trade secret that is the focal point of the tax issue before us. The question is straightforward: whether the settlement proceeds received by C&F should be classified as capital gain or ordinary income. The court agrees

with the Tax Court's decision that they should be classified as ordinary income. I disagree and conclude that the settlement proceeds should be classified as capital gain. And so, I respectfully dissent.[1]

I agree with the court and the Tax Court on the rule that "[t]he classification of amounts received in settlement of litigation is to be determined by the nature and basis of the action settled." *Nahey v. Commissioner*, 196 F.3d 866, 868 (7th Cir. 1999). But based on the record before us, I disagree with the Tax Court's conclusion that the nature of the claim brought by C&F against Pizza Hut is a claim for lost profits. Rather, it is a claim for the value lost when the trade secret was misappropriated by Pizza Hut.

When the litigation began, C&F brought claims against both Pizza Hut and its competitor, IBP. Most of the claims were dismissed for reasons not relevant here, but two claims remained viable: a claim of trade secret misappropriation against IBP for unlawfully using C&F's trade secret when it processed and sold sausage to Pizza Hut, and a claim of trade secret misappropriation

---

[1] On appeal, C&F brings two arguments. With respect to C&F's second argument, I agree with the court that the Tax Court correctly ruled that the settlement payment did not constitute the sale of a capital asset. Clearly there was no sale, and it would be difficult to equate the value of an arm's-length sale with an asset that was unilaterally misappropriated. It is with respect to C&F's primary argument that I part ways with the court.

against Pizza Hut for wrongfully disclosing C&F's trade secret.

Although the district court initially dismissed the claim against Pizza Hut, the claim against IBP was successful, with a jury awarding C&F $10.9 million in damages. When it came time to calculate its taxes, C&F determined that approximately $2.86 million of the total award corresponded to the amount of profits that C&F had lost by IBP's trade secret misappropriation. In other words, had IBP not been using C&F's trade secret, Pizza Hut would have bought more sausage from C&F instead of IBP, and $2.86 million corresponded to the profits from these lost sales with Pizza Hut. Thus, C&F treated that portion of the jury award as ordinary income and treated the remainder as capital gain.[2] The Commissioner apparently had no objection to this characterization. On appeal, the D.C. Circuit reversed the dismissal and reinstated C&F's trade secret misappropriation claim against Pizza Hut. With only the trade secret misappropriation claim against Pizza Hut remaining, Pizza Hut then settled for $15.3 million. The Tax Court concluded that the settlement proceeds were for lost profits.

But C&F did not lose profits to Pizza Hut—it lost them to IBP when Pizza Hut transferred the business to IBP.

---

[2] Because most of the $10.9 million jury award was first disbursed to attorneys and shareholders, C&F ultimately received only about $4 million. C&F then reported to the Commissioner its income in proportionate amounts—about $1 million in ordinary income and $3 million in capital gain.

What C&F did lose to Pizza Hut was value to its trade secret when Pizza Hut misappropriated it. In light of the IBP verdict, the profits lost to C&F from purchases that Pizza Hut made with IBP instead of C&F have already been accounted for in the jury award, and any additional money recovered from Pizza Hut cannot correspond to money from lost sales. In its opinion, the Tax Court dismissed this issue, saying that C&F could have also lost profits attributable to Pizza Hut that were not attributable to IBP. Nothing in the record supports that finding: instead, C&F's case is limited to Pizza Hut giving the secret to one competitor, IBP; C&F's lost profits went to IBP from IBP's sausage sales to Pizza Hut; and these profits were recovered as part of the jury award against IBP.

The Tax Court is wrong because it misread the complaint. In the complaint, after describing the elements of its trade secret misappropriation claim against Pizza Hut, C&F alleged that "[a]s a result, C&F has been damaged, and has suffered, among other things, lost profits, lost opportunities, operating losses and expenditures." [Tax Court decision, Appendix p.32] From this one phrase of "lost profits," the Tax Court concluded that C&F was only seeking lost profits against Pizza Hut. This is an incorrect way of reading the complaint. Recall, the complaint when first filed was against Pizza Hut and IBP. The nature of the claim that C&F was bringing against Pizza Hut was that Pizza Hut had wrongfully acquired and then disclosed a trade secret to C&F's competitor, IBP. This undoubtedly damaged C&F's

property interest in the trade secret.[3] Accordingly, in the complaint, the phrase "lost profits" was part of a non-exclusive list describing ways C&F had been injured by Pizza Hut's trade secret misappropriation. But this phrase "lost profits" did not negate the fact that C&F's trade secret had been severely damaged and that C&F was also seeking compensation for this damage. The Tax Court erroneously discarded the neighboring phrase "lost opportunities" which easily includes, for example, the lost opportunity to negotiate a transfer of the secret process to another pizza giant after Pizza Hut cut C&F off. The Tax Court was clearly wrong to conclude that the claim against Pizza Hut could only be for lost profits and that it wasn't also to compensate the injury to its trade secret, when the only profits lost

---

[3] The Commissioner makes the argument that C&F's trade secret did not lose value because it was not publicly distributed. But the fact that the disclosure was not public is not relevant; the value of the trade secret was still damaged by the disclosure to IBP because C&F had lost its competitive advantage to IBP. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1012 (U.S. 1984) ("With respect to a trade secret, the right to exclude others is central to the very definition of the property interest. Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data. . . . The economic value of that property right lies in the competitive advantage over others that [the holder of the trade secret] enjoys by virtue of its exclusive access to the data, and disclosure or use by others of the data would destroy that competitive edge.")

were those transferred to IBP. And as discussed above, at the time of the settlement, C&F had already received compensation for its lost profits by means of the jury award.

Although the Tax Court concluded that Pizza Hut paid the settlement to C&F for lost profits, there is nothing in the record indicating that the parties understood the settlement proceeds to be a payment equivalent to C&F's lost profits—there are no calculations indicating the equivalency between C&F's lost profits and the settlement amount. Instead, Pizza Hut paid the settlement proceeds to C&F in an agreement to settle all past, present, and future claims against Pizza Hut, in typical boilerplate language contained in any litigation-ending release agreement. And the only issue in that final phase of the litigation following the IBP verdict was the damage to the trade secret asset.

Other than its reliance on the single "lost profits" reference in the complaint, the Tax Court does not cite to anything in the record which supports the position that C&F's remaining claim against Pizza Hut was for lost profits. In fact, the record contained direct testimonial evidence to the contrary, which the Tax Court rejected as unreliable based on its reading of the "lost profits" phrase.

In sum, the "nature and basis" of the trade secret misappropriation claim, at the time when Pizza Hut entered into its settlement agreement following the IBP verdict, was a claim seeking compensation for the substantially diminished value inflicted upon the trade secret. *See*

*Nahey*, 196 F.3d at 868. And since a trade secret is a capital asset, the settlement should be characterized as capital gain.

I respectfully dissent.