# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2078

THEODORE R. ROLFS, *et al.*,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

Appeal from the United States Tax Court.
No. 9377-04—**Joseph H. Gale**, *Judge.*

ARGUED OCTOBER 25, 2011—DECIDED FEBRUARY 8, 2012

Before EASTERBROOK, *Chief Judge*, HAMILTON, *Circuit Judge*, and MYERSCOUGH, *District Judge*.[*]

HAMILTON, *Circuit Judge.* Taxpayers Theodore R. Rolfs and his wife Julia Gallagher (collectively, the Rolfs) purchased a three-acre lakefront property in the Village of Chenequa, Wisconsin. Not satisfied with the house

---

[*] The Honorable Sue E. Myerscough of the Central District of Illinois, sitting by designation.

that stood on the property, they decided to demolish it and build another. To accomplish the demolition, the Rolfs donated the house to the local fire department to be burned down in a firefighter training exercise. The Rolfs claimed a $76,000 charitable deduction on their 1998 tax return for the value of their donated and destroyed house. The IRS disallowed the deduction, and that decision was upheld by the United States Tax Court. *Rolfs v. Comm'r of Internal Revenue*, 135 T.C. 471 (2010). The Rolfs appeal. To support the deduction, the Rolfs needed to show a value for their donation that exceeded the substantial benefit they received in return. The Tax Court found that they had not done so. We agree and therefore affirm.

Charitable deductions for burning down a house in a training exercise are unusual but not unprecedented. By valuing their gifts as if the houses were given away intact and without conditions, taxpayers like the Rolfs have claimed substantial deductions from their taxable income. But this is not a complete or correct way to value such a gift. When a gift is made with conditions, the conditions must be taken into account in determining the fair market value of the donated property. As we explain below, proper consideration of the economic effect of the condition that the house be destroyed reduces the fair market value of the gift so much that no net value is ever likely to be available for a deduction, and certainly not here.

What is the fair market value of a house, severed from the land, and donated on the condition that it soon be

burned down? There is no evidence of a functional market of willing sellers and buyers of houses to burn. Any valuation must rely on analogy. The Rolfs relied primarily on an appraiser's before-and-after approach, valuing their entire property both before and after destruction of the house. The difference showed the value of the house as a house available for unlimited use. The IRS, on the other hand, presented experts who attempted to value the house in light of the condition that it be burned. The closest analogies were the house's value for salvage or removal from the site intact.

The Tax Court first found that the Rolfs received a substantial benefit from their donation: demolition services valued by experts and the court at approximately $10,000. The court then found that the Rolfs' before-and-after valuation method failed to account for the condition placed on the gift requiring that the house be destroyed. The court also found that any valuation that did account for the destruction requirement would certainly be less than the value of the returned benefit. We find no error in the court's factual or legal analysis. The IRS analogies provide reasonable methods for approximating the fair market value of the gift here. The before-and-after method does not.

I. *Legal Background Concerning Charitable Donations Under Section 170(a)*

The legal principles governing our decision are well established, and the parties focus their dispute on competing valuation methodologies. We briefly review

the relevant law, addressing some factual prerequisites along the way.

The requirements for a charitable deduction are governed by statute. Taxpayers may deduct from their return the verifiable amount of charitable contributions made to qualified organizations. 26 U.S.C. § 170(a)(1). Everyone agrees that the Village of Chenequa and its volunteer fire department are valid recipients of charitable contributions as defined under section 170(c). To qualify for deduction, contributions must also be unrequited — that is, made with "no expectation of a financial return commensurate with the amount of the gift." *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 690 (1989). The IRS and the courts look to the objective features of the transaction, not the subjective motives of the donor, to determine whether a gift was intended or whether a commensurate return could be expected as part of a quid pro quo exchange. *Id.* at 690-91.

The Treasury regulations implement the details of section 170, instructing taxpayers how to prove a deduction to the IRS and how to value donated property using its fair market value. Under section 1.170A-1(c) of the regulations, fair market value is to be determined as of the time of the contribution and under the hypothetical willing buyer/willing seller rule, wherein both parties to the imagined transaction are assumed to be aware of relevant facts and free from external compulsion to buy or sell. 26 C.F.R. § 1.170A-1(c). As with the question of the purpose of the claimed gift, fair market value requires an objective, economic inquiry and is a question of fact.

We can assume, as the record suggests, that the Rolfs were subjectively motivated at least in part by the hope of deducting the value of the demolished house on their tax return. Applying the objective test, however, we treat their donation the same as we would if it were motivated entirely by the desire to further the training of local firefighters. Objectively, the purpose of the transaction was to make a charitable contribution to the fire department for a specific use.[1] The Rolfs documented their donation and substantiated the basis of their valuation for the IRS as required by the regulations. The Tax Court did not hold that the transaction was categorically invalid under section 170(a), and we agree that nothing in the structure or technical execution of the Rolfs' donation precluded its potential validity as a qualifying charitable contribution under section 170(a). The Tax Court found instead that when the transaction was properly evaluated, the Rolfs (a) received a substantial benefit in exchange for the

---

[1] The fire chief asked the Rolfs for $1,000 in cash for the fire department to help defray costs of the training exercise. The Tax Court did not make an explicit finding as to whether the $1,000 cash donation was an essential condition for the fire department's acceptance of the donated house. If it was an essential condition, then in light of the Tax Court's finding that the Rolfs received benefits of up to $10,000 in demolition services in return, one might easily view the entire transaction objectively as merely a contract for discounted demolition services and not as a charitable donation at all. The IRS did not argue this theory, so we express no opinion on its possible merit.

donated property and (b) did not show that the value of the donated property exceeded the value of the benefit they received. We also agree with these findings. There was no net deductible value in this donation in light of the return benefit to the Rolfs.

A charitable contribution is a "transfer of money or property without adequate consideration*." United States v. American Bar Endowment*, 477 U.S. 105, 118 (1986). A charitable deduction is not automatically disallowed if the donor received any consideration in return. Instead, as the Supreme Court observed in *American Bar Endowment*, some donations may have a dual purpose, as when a donor overpays for admission to a fund-raising dinner, but does in fact expect to enjoy the proverbial rubber chicken dinner and accompanying entertainment. Where "the size of the payment is clearly out of proportion to the benefit received," taxpayers can deduct the excess, provided that they objectively intended it as a gift. *Id.* at 116-18 ("The taxpayer, therefore, must at a minimum demonstrate that he purposely contributed money or property in excess of the value of any benefit he received in return."). In practice then, the fair market value of any substantial returned benefit must be subtracted from the fair market value of the donation.

This approach differs from that of the Tax Court in *Scharf v. Comm'r of Internal Revenue*, T.C.M. 1973-265, an earlier case that allowed a charitable deduction for property donated to a fire department to be burned. In *Scharf*, a building had been partially burned and was about to be condemned. The owner donated the building to the

fire department so it could burn it down the rest of the way. The Tax Court compared the value of the benefit obtained by the donor (land cleared of a ruined building) to the value of the public benefit in the form of training for the firefighters, and found that the public benefit substantially exceeded the private return benefit. Thus, the donation was deemed allowable as a legitimate charitable deduction, and the court proceeded to value the donation using the established insurance loss figure for the building. The *Scharf* court did not actually calculate a dollar value for the public benefit, and if it had tried, it probably would have found the task exceedingly difficult. Although *Scharf* supports the taxpayers' claimed deduction here, its focus on public benefit measured against the benefit realized by the donor is not consistent with the Supreme Court's later reasoning in *American Bar Endowment*. The Supreme Court did not rely on amorphous concepts of public benefit at all, but focused instead on the fair market value of the donated property relative to the fair market value of the benefit returned to the donor. 477 U.S. at 116-18. The Tax Court ruled correctly in this case that the *Scharf* test "has no vitality" after *American Bar Endowment*. 135 T.C at 487.

With this background, the decisive legal principle for the Tax Court and for us is the common-sense requirement that the fair market valuation of donated property must take into account conditions on the donation that affect the market value of the donated property. This has long been the law. See *Cooley v. Comm'r of Internal Revenue*, 33 T.C. 223, 225 (1959) ("property otherwise

intrinsically more valuable which is encumbered by some restriction or condition limiting its marketability must be valued in light of such limitation"). In *Cooley*, the donor could not use the retail price of donated cars as their fair market value because a contractual condition prevented them from ever being sold at retail in the United States. The cars had been bought wholesale at a special discount price on the condition that they be donated overseas. *Id.* See also *Van Zelst v. Comm'r of Internal Revenue*, T.C.M. 1995-396 (requiring consideration of an injunction against mining in determining value of donated land); *Thornton v. Comm'r of Internal Revenue*, T.C.M. 1988-479 (accounting for cost of moving and re-interring remains when donating a cemetery for other uses); *Deukmejian v. Comm'r of Internal Revenue*, T.C.M. 1981-24 (refusing to value property in fee simple where the donation contained a condition, requested by the donee city, that the property be put only to public use).

## II.   *Valuation Methods*

As this case demonstrates, however, knowing that one must account for a condition in a valuation opens up a second tier of questions about exactly how to do so. The Tax Court weighed conflicting evidence on valuation and rejected the taxpayers' evidence claiming that the donated house had a value of $76,000. The Tax Court found instead that the condition requiring destruction of the house meant that the donated property had essentially no value. 135 T.C. at 494. The Tax Court did not err.

In this case there is no evidence of an actual market for, and thus no real or hypothetical willing buyers of, doomed houses as firefighter training sites. Fire departments typically conduct their training in burn towers, which are designed to withstand repeated exercises so that fire departments pay only a rental fee for use of a tower. Apparently the Village of Chenequa fire department has sometimes used a burn tower at a nearby technical college for training purposes, but there is no record evidence of how much the department pays for that use. Sometimes fire departments also conduct exercises using donated or abandoned property, but there is also no record evidence of any fire departments paying for such property. Without comparators from any established markets, the parties presented competing experts who advocated different valuation methods. The taxpayers relied on the conventional real estate market, as if they had given the fire department fee ownership of the house. The IRS relied on the salvage market and the market for relocated houses, attempting to account for the conditions proposed in the gift.

The taxpayers' expert witness is a residential appraiser. His suggested valuation methods treated the donation as one of real estate. This was not an ordinary real estate transaction, however, and the appraiser needed to account for the fact that only the house was being donated, while all rights to the three acres on which it sat were being retained. (The donation necessarily granted a temporary easement to permit the fire department to come onto the property to conduct its exercises, but neither party deemed this of significant value.) The

taxpayers argued that the "before-and-after" method should be applied. Their appraiser started with an estimated value of $675,000 for the land and house together, based on comparisons to recent sales of similar properties in the area. Using the same method, he estimated a value of $599,000 for the land alone, without any house on it. He subtracted the latter from the former to estimate $76,000 as the value of the house alone.

The before-and-after approach is used most often to value conservation easements, where it is hard to put a value on the donated conservation use. Experts can estimate both the value of land without the encumbrance and the value of the land if sold with the specified use limitations, using the difference to estimate the value of the limitations imposed by the donor. As we explain below, there are significant differences between the Rolfs' donation and a conservation easement. While this approach might superficially seem like a reasonable way to back into an answer for the house's value apart from the underlying land, the before-and-after method cannot properly account for the conditions placed on the recipient with a gift of this type. The Tax Court properly rejected use of the before-and-after method for valuing a donation of property on the condition that the property be destroyed.

The IRS presented two experts, both of whom used a "comparable sales" method of valuation. The IRS asserted that a comparable market could be sales of houses, perhaps historically or architecturally important structures, where the buyer intends to have the house

moved to her own land. Witness Robert George is a professional house mover who has experience through-out Wisconsin lifting houses from their foundations and transporting them to new locations. He concluded that it would cost at least $100,000 to move the Rolfs' house off of their property. Even more important, he opined that no one would have paid the owners more than nominal consideration to have moved this house. In his expert opinion, the land in the surrounding area was too valuable to warrant moving such a modest house to a lot in the neighborhood. George also opined that the salvage value of the component materials of the house was minimal and would be offset by the labor cost of hauling them away. These conclusions were supported by witness Marcia Solko, who works for the Wisconsin Department of Transportation and is responsible for clearing or moving houses off of property purchased by the state for highway construction. Solko also concluded that the cost of moving the Rolfs' house off the property would make it very unlikely that anyone would pay money to have it moved. Based on this testimony, the IRS argued that since the house would have had negligible value if sold under the condition that it be separated from the land and moved away, the house must also have negligible value if sold under the condition that it be burned down.

The Tax Court found that the parties to the donation understood that the house must be promptly burned down, and the court credited testimony by the fire chief that he knew the house could be put to no other use by the department. The court rejected the taxpayers' before-

and-after method as an inaccurate measure of the value of the house "as donated" to the department. The tax-payers' method measured the value of a house that remained a house, on the land, and available for residential use. The conditions of the donation, however, required that the house be severed from the land and destroyed. The Tax Court, accepting the testimony of the IRS experts, concluded that a house severed from the land had no substantial value, either for moving off-site or for salvage. Moving and salvage were analogous situations that the court found to be reasonable approximations of the actual scenario. We agree with these conclusions, which follow the *Cooley* principle by taking into account the economic effect of the main condition that the taxpayers put on their donation. The Tax Court correctly required, as a matter of law, that the valuation must incorporate any reduction in market value resulting from a restriction on the gift. We review the Tax Court's findings of fact for clear error and its conclusions of law de novo. *Freda v. Comm'r of Internal Revenue*, 656 F.3d 570, 573 (7th Cir. 2011). We find no clear error in the factual findings and conclude further that it would have been an error of law to ascribe any weight to the taxpayers' before-and-after valuation evidence.

The taxpayers argue on appeal that the before-and-after method actually does take the relevant conditions into account. Their argument boils down to an assertion that the "after" value takes the destruction requirement into account because the "after" value appraises

the land after the house was destroyed. This argument begs the question in classic fashion. No one disputes that $76,000 worth of home value was lost in the fire. The disagreement concerns the portion of that value, if any, that was actually transferred to the fire department by gift. By deciding to destroy the house and then making that demolition a condition of their gift, the taxpayers themselves became responsible for that decrease in value, even if the fire department provided the mechanism to accomplish it. None of the value of the house, as a house, was actually given away.[2]

The gift was not a timeshare interest, for which a pro-rated before-and-after valuation might be appropriate, nor was it a gift to a charity providing housing for needy families. The taxpayers here gave away only the right to come onto their property and demolish their

---

[2] We ascribe no sinister motives to the Rolfs in seeking this deduction, who could reasonably rely on *Scharf* to conclude that their proposed valuation might be allowed. A brief look at Google uncovers news stories about similar donations and attempted deductions by an ESPN commentator, a former Oregon gubernatorial candidate, and a New York investment banker. It would seem that an application of the before-and-after method to the New York donation might have produced a valuation of up to $1.2 million dollars. See Sarah Jordan, *They spent $4.2M on this house . . . then let firefighters burn it down*, N.Y. Post, Apr. 18, 2010, available at http://www.nypost.com/p/news/local/they_spent_down_this_house_then_ z4BQw7JNQgNmf0e12ev3VL (last visited Feb. 3, 2012).

house, a service for which they otherwise would have paid a substantial sum. (Testimony indicated that the taxpayers actually paid $1,000 of the department's costs as part of their donation.) The demolition condition placed on the donation of the house reduced the fair market value of the house to a negligible amount, well enough approximated by its negligible salvage value.

The authorities the taxpayers cite to support the before-and-after valuation method relate to conservation easements and other restrictive covenants, but the features of this donation are quite different from such an easement. When an easement is granted, part of the landowners' rights are carved out and transferred to the recipient. For example, the Forest Service might be given the right to manage undeveloped land, or a conservation trust might be given the right to control disposition of property. Because it can be difficult to measure the value of this sort of right in isolation, experts instead estimate the difference in sale price for property with and without similar encumbrances. Here, in contrast, the initial value of the home can be estimated with the before-and-after method, but the donation destroyed that residential value rather than transferred it.

That's why conservation easements provide a poor model for the situation here, and other possible valuation models suffer from a lack of supporting evidence. The value of the training exercises to the fire department is not in evidence. The fire chief testified in the Tax Court that he could not assign a specific value to the significant public benefit of the training — but in any

event, we know from *American Bar Endowment* that trying to measure the benefit to the charity is not the appropriate approach. Perhaps the best "comparable sales" comparison might have been the price paid by the fire department to rent a burn tower for the length of time the department conducted exercises in and around the lake house, but there is no such evidence here.

The Tax Court also undertook a fair market valuation of the benefit received by the taxpayers. The expert witnesses for the IRS both agreed with Mr. Rolfs' own testimony (based on his investigation) that the house would cost upwards of $10,000 to demolish. Rolfs claimed that he actually received no real value from the burn because, even after the training exercises were complete, he still had to pay $10,000 to $15,000 for debris clearing and foundation removal. The Tax Court did not credit this latter testimony, finding no substantiation for this claim in the documentary evidence, which did not break out construction expenses by type or purpose. Common sense tells us that whatever destruction was caused by the fire would have cost money if performed by workers with sledgehammers or a wrecking ball, even if additional clean-up was required. We see no error in the Tax Court's factual determination, based on the available evidence and testimony, that the Rolfs received a benefit worth at least $10,000.

When property is donated to a charity on the condition that it be destroyed, that condition must be taken into account when valuing the gift. In light of that condition, the value of the gift did not exceed the fair market value

of the benefit that the donating taxpayers received in return. Accordingly, the judgment of the Tax Court is AFFIRMED.[3]

---

[3] The IRS offered an alternate theory for denying the Rolfs' deduction: that the gift transferred only a limited right to use (i.e., burn down) a house and therefore was not a qualifying contribution under 26 U.S.C. § 170(f)(3), which denies deductions for gifts of most partial interests in property. Under section 170(f)(3), donations for mere use do not qualify for deduction if the donor retains a substantial interest that may interfere with the donated use. See *Stark v. Comm'r of Internal Revenue*, 86 T.C. 243, 252-53 (1986). The Tax Court did not reach this question, and we affirm without reaching it.