T.C. Memo. 2018-31

UNITED STATES TAX COURT

JAMES C. PLATTS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10916-10.                    Filed March 19, 2018.

James C. Platts, pro se.

<u>Julia L. Wahl</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in petitioner's

Federal income tax, additions to tax, and penalties as follows:

[*2]

|  |  | Addition to tax | Penalties | |
| Year | Deficiency | sec. 6651(a)(1) | Sec. 6662(a) | Sec. 6663 |
|---|---|---|---|---|
| 1999 | $91,140 | $3,806.30 | -0- | $68,355.00 |
| 2000 | 6,185 | -0- | -0- | 4,638.75 |
| 2001 | 58,908 | 14,002.75 | $11,434.40 | 1,302.00 |

The issues for decision are:

1. Whether certain purported records of the Pinnacle Building Co. (Pinnacle) are admissible into evidence. We hold they are not.

2. Whether $51,638 that petitioner received in 1999 was taxable wages or repayment of loans he had made to Pinnacle. We hold that this amount was taxable wages.

3. Whether $75,738 that petitioner received in 1999 and $20,789 that he received in 2000 were constructive dividends or repayment of loans from Pinnacle. We hold that petitioner had constructive dividends of $61,237.50 for 1999 and $20,789 for 2000.

4. Whether petitioner is entitled to a capital loss deduction for 1999 or capital loss carryforward deductions for 2000 and 2001. We hold that he is not.

**[\*3]**   5.  Whether petitioner is entitled to a charitable contribution deduction for the donation of building parts to a tax-exempt organization in 2001.  We hold that he is not.

6.  Whether petitioner is liable for additions to tax under section 6651(a)(1) for the late filing of his 1999 and 2001 income tax returns.[1]  We hold that he is.

7.  Whether petitioner is barred by the doctrine of collateral estoppel from denying that respondent's assessments of tax for 1999, 2000, and 2001 were timely.  We hold that he is.

8.  Whether petitioner is liable for the accuracy-related penalty under section 6662 for 2001 or the fraud penalty under section 6663 for 1999, 2000, and 2001.  We hold he is not.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

1.   Petitioner

Petitioner resided in Pennsylvania when he filed the petition.  He attended Pennsylvania State University for approximately two years after he graduated from high school in 1969.  Petitioner was married to Deborah L. Platts during 1999,

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*4] 2000, and 2001. Petitioner and his wife maintained a checking account at Citizens Bank from May 19, 1999, through 2001.

2.     Pinnacle

During the years at issue petitioner was the sole owner and president of Pinnacle, a residential construction business. Pinnacle was a subchapter C corporation.

Pinnacle filed Forms 1120, U.S. Corporation Income Tax Return, for 1990-97. Petitioner signed the Forms 1120 as president of Pinnacle. Pinnacle reported that it had loans from shareholders on its returns for years up to and including 1992. Pinnacle did not report the existence of any loans from shareholders after its 1992 tax year, and no loans from shareholders were shown on the books and records of Pinnacle after the mid-1990s. Petitioner owed money to Pinnacle from 1994 through 1997. Pinnacle did not file Forms 1120 for any period after 1997.

Pinnacle's earnings and profits were $115,981 at the end of 1997 and exceeded $75,738 in 1999 and $20,789 in 2000.

3.     Payments From Pinnacle to Petitioner in 1999, 2000, and 2001

Pinnacle paid net wages to petitioner biweekly in years before and in the first few months of 1999. Petitioner reported wages from Pinnacle on his 1995

[*5] through 1998 tax returns. In 1999 Pinnacle had a bank account with National City Bank.

Petitioner's gross salary from Pinnacle was $7,500 per two-week pay period in 1999 until Pinnacle ceased operating later that year. In 1999 petitioner received six checks from Pinnacle for $4,856.40 each (i.e., $7,500 less withholding) and three checks for $7,500 each. The six checks for $4,856.40 bore the preprinted phrase "Payroll Check". The three checks for $7,500 did not bear a preprinted phrase identifying them as payroll checks. Taxes were not withheld from these three payments. All nine checks were from Pinnacle's checking account at National City Bank. The last of these nine checks was dated May 31, 1999.

During 1999 petitioner endorsed five checks payable to Pinnacle totaling $32,937.50 and deposited them into his personal account at Citizens Bank. In 1999 Pinnacle recorded the six payments of $4,856.40 and the three payments of $7,500 as wages in its books and records. In 2000 petitioner cashed or deposited into his personal checking account at Citizens Bank four checks totaling $20,789 which were payable to Pinnacle and which were written by its customers.

4. Pinnacle Development Group

On May 10, 1999, petitioner and his wife opened a checking account at Citizens Bank in the name of Pinnacle Development Group. They were the only

[*6] individuals with signature authority over the account, and in 1999 petitioner wrote three checks payable to himself totaling $14,500 from Pinnacle Development Group's account at Citizen's Bank.

In June 1999 petitioner deposited three checks totaling $28,300 which represented payment by Pinnacle's customers for services it rendered into the Pinnacle Development Group account at Citizens Bank. The only other deposits into the Pinnacle Development Group account in 1999 were a $13,000 check from 504 Building Group, an entity that petitioner controlled, and $1,100 in miscellaneous deposits.

5.      Petitioner's Charitable Contribution to the Pine Valley Bible Camp

In 2001 petitioner was one of two 50% partners in the Registry Group, a real estate development partnership. The Registry Group owned real estate on Registry Lane, including a house at 1013 Registry Lane which it used as an office. The Registry Group sold lots on Registry Lane for residential development.

The Registry Group donated the house at 1013 Registry Lane to the Pine Valley Bible Camp, the tax-exempt status of which is not in dispute, with the understanding that camp volunteers would disassemble the house and move the building materials to the camp. They did that in October 2000.

**[\*7]**   On Form 1040, U.S. Individual Income Tax Return, for 2001 petitioner reported (without reference to the Registry Group) that he had donated an intact house with a value of $176,255 to the Pine Valley Bible Camp.  The reported value of $176,255 was the appraised value of the intact house as of August 31, 1999, as stated in an independent appraisal prepared by R. Robert Barone, Jr., which petitioner obtained on November 8, 2002.

Petitioner wrote a note to his certified public accountant (C.P.A.) stating that he and his wife had donated an intact house to their church in the prior year and wanted to deduct half of its value on their return.  In an accompanying letter dated both August 31, 1999, and August 31, 2000, petitioner estimated that the value of the intact house was $163,200.

6.    Petitioner's Tax Returns

Petitioner and his wife filed joint Forms 1040 for 1999, 2000, and 2001. Petitioner filed their 1999 Form 1040 on August 17, 2000, and their 2001 Form 1040 on September 2, 2003.  Petitioner obtained an extension of time until October 15, 2002, to file their 2001 Form 1040.

Petitioner did not provide the C.P.A. who prepared the 1999 return with any verification of the reported amounts of income.  The C.P.A. required petitioner and his wife to sign a letter acknowledging, inter alia, that they had provided the

[*8] C.P.A. with no verification of those amounts; that Pinnacle had gone out of business during 1999; and that its stock had become worthless in 1999.

On Schedule D, Capital Gains and Losses, of the 1999 Form 1040, petitioner reported a long-term capital loss of $180,122, calculated by netting certain amounts reported on Pinnacle's 1995 return against petitioner's claimed $200,000 loan to Pinnacle. Petitioner carried over the unused portion of the long-term capital loss, $17,335, to the 2000 and 2001 Forms 1040.

7. Petitioner's Criminal Cases

a. Income Tax Evasion and Withholding Tax Evasion

On January 16, 2007, petitioner was indicted under section 7201 on one count of income tax evasion for 1999 and four counts of evasion of withholding tax from wages and FICA taxes due and owing by Pinnacle for three quarters of 1998 and the first quarter of 1999.

On December 5, 2007, petitioner's defense counsel in his income tax evasion case filed a motion in that case to obtain permission for petitioner to travel to Florida. In that motion, petitioner's defense counsel stated that petitioner wanted to visit his daughter in Florida for Christmas and return with an automobile, clothing, and two pets. The motion did not say petitioner wanted to obtain Pinnacle records from a storage unit in Florida that were essential to his

[*9] defense in that case. Petitioner did not present any documentary evidence at the trial in his income tax evasion case that he had made loans to Pinnacle which were outstanding in 1999. On June 25, 2008, petitioner was convicted on all counts. He was sentenced to 30 months in prison.

b.      Money Laundering and Mail Fraud

On February 1, 2011, a grand jury sitting in the U.S. District Court for the Western District of Pennsylvania indicted petitioner on six counts of money laundering, mail fraud, and conspiracy. The indictment alleged that petitioner had conspired with others to falsely and fraudulently obtain mortgages. Petitioner pleaded guilty to all of the counts in the indictment. He was sentenced to prison for 46 months on each count to be served concurrently.

8.      Notice of Deficiency and Petition

Respondent issued a notice of deficiency to petitioner and his wife for their taxable years 1999, 2000, and 2001.[2] Petitioner timely petitioned this Court. Trial was held in Pittsburgh, PA. Petitioner appeared for the first day of the trial but not for the second day.

---

[2]Respondent granted Ms. Platts relief from joint and several liability under sec. 6015(b).

[*10]                              OPINION

1.      Burden of Proof

Petitioner contends that the burden of proof shifts to respondent under section 7491.  If a taxpayer complies with all substantiation and recordkeeping requirements under the Internal Revenue Code and introduces credible evidence with respect to any factual issues relevant to ascertaining the taxpayer's liability, the Commissioner has the burden of proof with respect to that issue.  See also sec. 7491(a)(1) and (2)(A) and (B); Rule 142(a).  Petitioner has not satisfied the requirements of section 7491(a) to shift the burden of proof to respondent.  Thus, petitioner bears the burden of proof.  See Rule 142(a).[3]

2.      Whether Records Petitioner Contends Were in a Storage Unit in Florida and
        His Home Before and During the Income Tax Evasion Trial Are Admissible

Petitioner offered into evidence documents which he contends are Pinnacle business records that were in his home before 2007.  Petitioner also contends that these documents were in a storage locker in Florida from 2007 to 2011 and were again in his possession from 2011 until the time of trial in this case.  The records

---

[3]The parties dispute whether they stipulated to include in the record of this case the testimony at petitioner's income tax evasion trial of Pinnacle's former bookkeeper, Victoria Mazur, f.k.a. Victoria Orris, f.k.a. Victoria Skinner (hereinafter Ms. Mazur).  We need not decide this dispute because we have not considered Ms. Mazur's testimony in deciding this case.

**[*11]** at issue purport to be resolutions of the directors of Pinnacle, minutes of special meetings, promissory notes which authorize petitioner to act on behalf of Pinnacle to borrow money from petitioner, and documents relating to purported loans from petitioner to Pinnacle.

Petitioner contends that these records show that: (1) Pinnacle's payments to him in 1999 were not salary but were repayments of loans he had made to Pinnacle and (2) petitioner sustained capital losses when Pinnacle ceased operations in 1999 because Pinnacle had failed to repay various notes owing to him. Respondent objected on several grounds to the admission of these records. As discussed next we hold that these records are not admissible.

Petitioner had a compelling reason to introduce these records into evidence at his income tax evasion trial. If these records had been offered, admitted, and found credible, they would have rebutted the prosecution's primary theory. But petitioner did not offer them into evidence even though he testified at the trial in this case that he and/or his daughter had access to these records before and during his income tax evasion trial. Petitioner testified that other records were seized from his home in 2001 when a search warrant was executed on his home and that these records also were there hidden in his home during the search, were not discovered, and were not otherwise provided to prosecutors or his defense counsel

[*12] before that trial. Petitioner did not explain why he sought to conceal records which might well have rebutted the criminal charges. These circumstances cause strong doubts that the records are what petitioner contends they are.

The trial in the income tax evasion case was held in June 2008. Petitioner's daughter apparently moved to Florida in 2007. Petitioner contends that he took the records to Florida at that time and placed them in a storage locker, that the documents remained in storage in Florida until 2011, and that in 2011 his daughter sent the records to him in Pennsylvania. He first provided the records to respondent in this case in 2017.

Petitioner contends that one of his reasons for wanting permission to travel to Florida in 2007 was to obtain access to the records. The motion petitioner filed in his income tax evasion case did not refer to Pinnacle's records even though he had a compelling reason to obtain those records to support his defense in that case. Petitioner testified that there were only a couple of boxes of records in the storage locker. It appears that petitioner's daughter could have sent records to him at any time. We do not understand why this would not have been done for records that were essential to his defense in the income tax evasion case.

We decide whether a witness' testimony is credible by relying on objective facts, the reasonableness of the testimony, the consistency of statements made by

**[*13]** the witness, and the demeanor of the witness. See Quock Ting v. United States, 140 U.S. 417, 420-421 (1891); Wood v. Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), aff'g 41 T.C. 593 (1964); Pinder v. United States, 330 F.2d 119, 124-125 (5th Cir. 1964); Concord Consumers Hous. Coop. v. Commissioner, 89 T.C. 105, 124 n.21 (1987). We may discount testimony which we find to be unworthy of belief, see Tokarski v. Commissioner, 87 T.C. 74, 77 (1986), but we may not arbitrarily disregard testimony that is competent, relevant, and uncontradicted, see Conti v. Commissioner, 39 F.3d 658, 664 (6th Cir. 1994), aff'g and remanding 99 T.C. 370 (1992), and T.C. Memo. 1992-616.

At trial petitioner asked that the Court mark for identification Exhibits 66-P through 106-P. The Court reserved ruling on the admissibility of the exhibits and ordered the parties to address the issue in their posttrial briefs.

Exhibits 66-P through 106-P were not provided to respondent 14 days before trial as required by our standing pretrial order, served on the parties in this case five months before trial. The Court follows the Federal Rules of Evidence. Sec. 7453. Evidence is inadmissible if it has not been authenticated or identified. Fed. R. Evid. 901. Petitioner has not authenticated these exhibits. Petitioner, in effect, asserts that these records exonerating him from income tax evasion charges were available to him before and during that trial, but he did not arrange, either

**[\*14]** himself or through his defense counsel or his daughter, to bring them to that trial. That is so unlikely that we do not accept that the documents are what petitioner says they are. We therefore sustain respondent's objections to the admission of Exhibits 66-P through 106-P except for those exhibits or portions thereof which respondent has stipulated.[4]

3.     Whether Payments Petitioner Received in 1999 From Pinnacle Were Taxable Wages or Repayment of Loans He Had Made to Pinnacle

Petitioner has not denied that he received payments from Pinnacle in 1999 in the amounts respondent determined. Petitioner contends that these amounts were the nontaxable repayment of loans that he had made to Pinnacle. We have found inadmissible the notes petitioner says were proof of these loans. Thus, the only evidence in the record of any loans to Pinnacle is petitioner's testimony.

Petitioner testified that payroll checks were loan repayments because Pinnacle's supply of general checks was exhausted. We disagree. The record

---

[4]Respondent has now stipulated the admission of the following exhibits or portions of exhibits offered by petitioner, which are therefore admitted into evidence: Exhibit 68(C, D, and E), Exhibit 69(C), Exhibit 70(C and D), Exhibit 71(C), Exhibit 72(C), Exhibit 73(C), Exhibit 74(C), Exhibit 75(C and D), Exhibit 76(C, D, H, I, and J), Exhibit 77(B), Exhibit 78(C), Exhibit 79(C, D, E, F, G, I, and J), Exhibit 81(C), Exhibit 82(C), Exhibit 83(H, I, J, and K), Exhibit 84(C), Exhibit 85(C and D), Exhibit 86(C), Exhibit 87(C, D, E, and F), Exhibit 88(C and D), Exhibit 90(C and D), Exhibit 91(C), Exhibit 92, Exhibit 93, Exhibit 94, Exhibit 95, Exhibit 99, and Exhibit 100.

[*15] shows that some general checks were written after these payments were made using payroll checks.

Petitioner contends that he made several loans to Pinnacle. However, he claimed a long-term capital loss resulting from only one of them on his 1999 return. Pinnacle reported outstanding loans from shareholders on its 1990 and 1991 returns. Pinnacle's returns show that there were no outstanding loans to Pinnacle after 1992. We do not understand why petitioner would have claimed a loss resulting from only one loan for $200,000 if he had lent far more than that, or why Pinnacle did not report outstanding loans to shareholders as it had done in the past, if in fact the loans were genuine.

Around 2001 Special Agent Jeffrey Miller, who worked in the IRS Criminal Investigation Division, was assigned to an investigation for petitioner's 1999 tax year. Special Agent Miller interviewed petitioner regarding whether petitioner had received wages that were not reported on his return. Petitioner told Special Agent Miller that the only loans he made to Pinnacle were made in the early 1990s. Special Agent Miller interviewed Ms. Mazur and reviewed Pinnacle's books and records with her. Mr. Miller also reviewed records of Pinnacle that had been seized by the District Attorney's office. Mr. Miller did not find any record of loans from petitioner to Pinnacle after 1992. Petitioner testified in his income tax

[*16] evasion trial that it would not make sense to draft a promissory note to himself when taking money out of his account and depositing it into Pinnacle's account, because it would be "basically out of one pocket and putting it into another." Petitioner's testimony at the trial in this case that his loans to Pinnacle had been duly recorded with promissory notes is contrary to his 2008 testimony. Thus, we conclude that Pinnacle did not have outstanding loans to petitioner during the years at issue and that its payments to petitioner were salary.

4.  <u>Whether $75,738 Petitioner Received in 1999 and $20,789 He Received in 2000 Were Constructive Dividends or Repayment of Loans From Pinnacle</u>

Petitioner does not dispute receiving the payments which respondent determined were constructive dividends but contends that those amounts were loan repayments.

Gross income includes dividends. Sec. 61(a)(7). A dividend is "any distribution of property made by a corporation to its shareholders" from earnings and profits. Sec. 316(a). Section 301 provides that funds distributed by a corporation over which the taxpayer/shareholder has dominion and control are taxed under section 301(c). A dividend is ordinary income to the recipient under section 301(c)(1) to the extent of the earnings and profits of the corporation. A constructive dividend arises where a corporation confers an economic benefit on a

[*17] shareholder without the expectation of repayment, even though neither the corporation nor the shareholder intended a dividend. Welle v. Commissioner, 140 T.C. 420, 422 (2013).

On May 10, 1999, petitioner opened a bank account in the name of Pinnacle Development Group. The account was controlled solely by petitioner and his wife. The record reveals no purpose for Pinnacle Development Group other than to serve as a conduit to transfer money from Pinnacle to petitioner.

On May 31, 1999, Pinnacle made its final biweekly wage payment to petitioner. Shortly before that, on May 24, 1999, petitioner deposited the first in a series of checks totaling $32,937.50 made payable to Pinnacle by Pinnacle customers into his own bank account. In June 1999 petitioner deposited three checks totaling $28,300 payable to Pinnacle into the Pinnacle Development Group account. In 1999 petitioner wrote three checks to himself from the Pinnacle Development Group account totaling $14,500. The sum of these three groups of checks is $75,738, which respondent contends represents the constructive dividends to petitioner for 1999. Respondent double counted as to the $14,500 which petitioner withdrew from the Pinnacle Development Group account. The checks payable to Pinnacle totaling $32,937.50 that petitioner deposited into his own account and the checks totaling $28,300 payable to Pinnacle that he deposited

[*18] into the Pinnacle Development Group account were an economic benefit to petitioner. Petitioner had constructive dividends of $61,237.50 for 1999. In addition, the four checks written to Pinnacle which petitioner cashed or deposited into his account in 2000, totaling $20,789, were constructive dividends to petitioner for 2000.

If a corporation has insufficient earnings and profits, the distribution is a return of capital; and if the shareholder's basis in the stock is consumed, then the distribution is capital gain. Sec. 301(c)(2) and (3). Pinnacle had earnings and profits of $115,981 at the end of 1997. Pinnacle did not file an income tax return after 1997. There is no evidence in the record to show any change to Pinnacle's earnings and profits before 1999. The sum of Pinnacle's 1999 and 2000 distributions to petitioner is $82,026.50. Thus, Pinnacle's distributions to petitioner in 1999 and 2000 were taxable to petitioner as ordinary income.

5.   Whether Petitioner Is Entitled to a Capital Loss Deduction for 1999 or Capital Loss Carryforward Deductions for 2000 and 2001

Petitioner reported a long-term capital loss on his 1999 return. His claim for entitlement to that deduction is based on his claim that Pinnacle owed him $200,000.

[*19] The C.P.A. who prepared petitioner's 1999 return was unable to verify the existence of the claimed loans and asked petitioner to sign a statement that the return was based entirely on amounts provided by petitioner and his representation of the amounts of outstanding loans.

There is no credible evidence that petitioner made loans to Pinnacle after 1992 or that there was any outstanding debt from Pinnacle to petitioner in 1999 when petitioner reported the loss. Therefore, petitioner is not entitled to the capital loss deduction for 1999 or the capital loss carryforward deductions for 2000 and 2001.

6. <u>Whether Petitioner Is Entitled to a Charitable Contribution Deduction for the Donation of a Demolished Building to a Tax-Exempt Organization in 2001</u>

Petitioner claimed a charitable contribution deduction for 2001 for the donation of building materials taken from a demolished house owned by the Registry Group, a partnership in which petitioner was a 50% partner. Petitioner claimed that the fair market value of his contribution was $176,255, which was 100% of the value of the house as appraised by Mr. Barone. Petitioner did not claim half of that amount as a 50% partner. In support of his claimed deduction, petitioner attached to his 2001 return (1) Form 8283, (2) a November 8, 2002,

[*20] letter from his appraiser, (3) an unsigned, undated "Square Foot Appraisal Form", and (4) a page containing several photographs of a standing residence.

Section 170(a)(1) allows a deduction for charitable contributions made during the taxable year. According to section 1.170A-13(c)(2)(i), Income Tax Regs., in order to claim a charitable contribution deduction in excess of $5,000 for a donation of property, a donor must obtain a qualified appraisal for the contributed property, attach a fully completed appraisal summary to the return, and maintain records containing certain information.

If the contributed property is a partial interest, the appraisal shall be of the partial interest. Id. Because petitioner, through the Registry Group, owned only 50% of the house, at most he would be able to deduct 50% of its value. However, as discussed next, petitioner may not deduct even one-half of the value of the claimed charitable contribution deduction for 2001.

If a taxpayer makes a charitable contribution of property other than money, the amount of the contribution is generally equal to the fair market value of the property at the time of the contribution. See sec. 1.170A-1(c)(1), Income Tax Regs. To be entitled to deduct a charitable contribution, a taxpayer must satisfy numerous statutory and regulatory substantiation requirements. See sec. 170(a)(1).

**[\*21]** First, petitioner did not contribute an intact structure; he merely contributed building parts. Petitioner did not provide an appraisal of the building parts. An appraisal of an intact structure is not relevant to deciding the value of the building parts extracted from that structure. See Rolfs v. Commissioner, 135 T.C. 471, 491 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

Second, as reported to the IRS by the donee organization, petitioner made the donation in October 2000. He deducted it for tax year 2001. A charitable contribution may be deducted only for the year in which it was made. Sec. 170(a)(1).

Third, the appraisal prepared by Mr. Barone which petitioner attached to Form 8283 of his 2001 return is not a qualified appraisal for several reasons. A qualified appraisal must be received by the donor before the due date (including extensions) of the return on which a deduction is first claimed. Sec. 1.170A-13(c)(3)(iv)(B), Income Tax Regs. The due date of petitioner's 2001 return (with extensions) was October 15, 2002. Mr. Barone's appraisal transmittal letter was prepared on November 8, 2002, after the October 15, 2002, due date for filing the 2001 Form 1040. Therefore the appraisal was prepared too late to qualify under the regulations.

**[\*22]** Also, the valuation date in the Barone appraisal was August 31, 1999. The donee received the donation in October 2000. A qualified appraisal is one that is made no earlier than 60 days before the date of contribution of the appraised property. Sec. 1.170A-13(c)(3)(i)(A), Income Tax Regs. Therefore the valuation date was too early for the appraisal to qualify under the regulations.

A qualified appraisal shall include a description of the donated property in sufficient detail to ascertain that the property that was appraised is the property that was contributed. Id. subdiv. (ii)(A). Both the Barone appraisal and petitioner's self-made appraisal identify and value the donated property as a standing dwelling rather than building parts. The regulations require that a qualified appraisal include the terms of any agreement by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property. Id. subdiv. (ii)(D).

A taxpayer may be able to deduct a charitable contribution by substantial compliance with the detailed requirements in the regulations. Bond v. Commissioner, 100 T.C. 32, 41 (1993); Dunavant v. Commissioner, 63 T.C. 316, 319-320 (1974). However, petitioner's compliance here was far from substantial. We conclude that petitioner is not entitled to a charitable contribution deduction for the donation of building parts in 2001.

**[*23]** 7.     Whether Petitioner Is Liable for Additions to Tax Under Section 6651(a)(1) for the Late Filing of His 1999 and 2001 Income Tax Returns

Section 6651(a)(1) imposes an addition to tax for failure to timely file a required tax return. Section 7491(c) places on the Commissioner the burden of producing evidence of liability for additions to tax. To meet that burden, the Commissioner must produce evidence showing that it is appropriate to impose that particular addition to tax, but the Commissioner need not produce evidence relating to defenses such as reasonable cause or substantial authority. Higbee v. Commissioner, 116 T.C. 438, 446 (2001); H.R. Conf. Rept. No. 105-599, at 241 (1998), 1998-3 C.B. 747, 995. Respondent has met the burden of production with respect to the additions to tax because petitioner did not timely file his returns for 1999 and 2001.

Once the Commissioner meets the burden of production, the taxpayer must, in order to avoid liability for the addition to tax, produce evidence that the failure was due to reasonable cause and not willful neglect. Sec. 6651(a)(1); United States v. Boyle, 469 U.S. 241, 245 (1985); Higbee v. Commissioner, 116 T.C. at 446; H.R. Conf. Rept. No. 105-599, supra at 241, 1998-3 C.B. at 995. Reasonable cause exists if the taxpayer exercised ordinary business care and prudence but nevertheless could not file within the prescribed time. Boyle, 469

**[*24]** U.S. at 246.  Petitioner has provided no explanation for his failure to timely file his returns.  Therefore, petitioner is liable for the additions to tax for 1999 and 2001.

8.    Whether Petitioner Is Barred by the Doctrine of Collateral Estoppel From Denying That Respondent's Assessments of Tax for 1999, 2000, and 2001 Were Timely

Petitioner contends that the time limits for assessing tax for the tax years at issue here have passed.  The Commissioner generally must assess any income tax within the three-year period after a taxpayer files his or her return.  Sec. 6501(a).  Respondent mailed the notice of deficiency on which this case is based on April 12, 2010, more than three years after petitioner's 1999 through 2001 income tax returns were filed.  In the case of a false or fraudulent return with the intent to evade tax, however, tax determined to be due may be assessed at any time.  Sec. 6501(c)(1).

A conviction for income tax evasion for a year under section 7201 after a trial on the merits collaterally estops a taxpayer from denying fraudulent intent under section 6501(c)(1) for that year.  Collateral estoppel applies if the issue to be precluded is the same as that involved in the prior action, that issue was actually litigated, the issue was determined by a final and valid judgment, and the determination was essential to the prior judgment.  See Anderson v.

[*25] <u>Commissioner</u>, 698 F.3d 160, 164 (3d Cir. 2012), <u>aff'g</u> T.C. Memo. 2009-44. Under the doctrine of collateral estoppel, conviction for income tax evasion for a year conclusively establishes that the defendant committed tax fraud for that year. <u>Blohm v. Commissioner</u>, 994 F.2d 1542, 1554 (11th Cir. 1993), <u>aff'g</u> T.C. Memo. 1991-636; <u>Klein v. Commissioner</u>, 880 F.2d 260, 262 (10th Cir. 1989), <u>aff'g</u> T.C. Memo. 1984-392. Petitioner was convicted of income tax evasion for 1999. Therefore, petitioner's underpayment for 1999 is attributable to fraud, and an exception to the general three-year period of limitation applies. <u>See</u> sec. 6501(c)(1); <u>Neely v. Commissioner</u>, 116 T.C. 79, 85 (2001). Thus, respondent's assessment for petitioner's 1999 tax year is timely.

A portion of each underpayment for 2000 and 2001 results from the carryforward of the fraudulently claimed capital loss from 1999. An underpayment is due to fraud when it is caused by the carryback or carryover of a fraudulent loss. <u>Arc Elec. Constr. Co. v. Commissioner</u>, 923 F.2d 1005, 1010 (2d Cir. 1991), <u>rev'g</u> T.C. Memo. 1990-30; <u>Hall v. Commissioner</u>, T.C. Memo. 1990-244. Thus, petitioner is barred by the doctrine of collateral estoppel from denying that he committed tax fraud for 2000 and 2001 because of the carryover of capital losses from 1999 to those years.

[*26] 9. <u>Whether Petitioner Is Liable for the Accuracy-Related Penalty Under Section 6662 for 2001 or the Fraud Penalty Under Section 6663 for 1999, 2000, and 2001</u>

Respondent determined that the portion of the underpayment resulting from the disallowance of the charitable contribution deduction that petitioner claimed for 2001 for the donation of materials from a house was subject to the section 6662(a) accuracy-related penalty. Respondent did not determine that petitioner is liable for the fraud penalty with respect to this adjustment. Respondent also determined that petitioner is liable for the fraud penalty under section 6663 for 1999, 2000, and 2001. Petitioner disputes in his pleadings and at trial that he is liable for either of these penalties.

As noted, petitioner's 1999, 2000, and 2001 tax years remain open under section 6501 because of collateral estoppel. However, petitioner is not liable for the fraud penalty under section 6663 if the record does not show that penalty was properly determined by respondent. See Graev v. Commissioner, 149 T.C. ___, ___ (slip op. at 13-14) (Dec. 20, 2017), supplementing 147 T.C. ___ (Nov. 30, 2016). In order to meet the burden of production for either of these penalties, respondent must show that there was written supervisory approval of the initial penalty determination. See secs. 6751(b)(1), 7491(c); Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42;

[*27] <u>Graev v. Commissioner</u>, 149 T.C. at ___ (slip op. at 13-14). The record contains no evidence of the requisite supervisory approval for either of these penalties. Thus, respondent did not meet the burden of production and petitioner is not liable for the accuracy-related penalty for 2001 or the fraud penalty for 1999-2001. <u>See</u> <u>Ford v. Commissioner</u>, T.C. Memo. 2018-8.

10. <u>Petitioner's Other Arguments</u>

Petitioner contends that he had a right to have a hearing and to present evidence during respondent's audit of his returns at issue in this case. We note that on March 3, 2009, after the conclusion of the income tax evasion case, Internal Revenue Agent Heather Whitmore wrote petitioner to advise him that she had been assigned to examine his returns to determine the correct tax, penalties, and interest for the years at issue. In that letter she offered to schedule a meeting. The record does not show whether petitioner met with Ms. Whitmore. Petitioner also contends that certain unspecified business records were seized from him during one of the criminal cases and not returned to him. Petitioner provided insufficient factual support or legal authority to prevail on either of these contentions.

**[\*28]** To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.